**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 8, 2012

Lyle W. Cayce
Clerk

No. 11-20013

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

HOWARD GRANT, OBISIKE NWANKWO, CLINTON LEE,

Defendants-Appellants

Appeals from the United States District Court
for the Southern District of Texas

Before GARZA, DENNIS, and HIGGINSON, Circuit Judges.

STEPHEN HIGGINSON, Circuit Judge:

After a jury trial, defendants Dr. Howard Grant ("Grant"), Obisike Nwankwo ("Nwankwo"), and Clinton Lee ("Lee") were convicted of conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349. Grant also was convicted of two counts of aiding and abetting health care fraud in violation of 18 U.S.C. §§ 1347 and 2.

Grant, Nwankwo, and Lee each appeal their convictions, claiming insufficiency of the evidence. Grant also raises the following three issues on appeal: (1) whether the district court plainly erred by admitting co-conspirator Doris Vinitski's statements; (2) whether the government's cross-examination of Dr. Grant constituted reversible prosecutorial error; and (3) whether the district

No. 11-20013

court abused its discretion by not giving a missing witness instruction to the jury.

**FACTS**

Between 2003 and 2009, Onward Medical Supply ("Onward"), a Houston company run by Doris Vinitski ("Vinitski"), fraudulently billed Medicare for durable medical equipment that patients did not need. After a series of inspections over several years by Mark Porter, a Medicare auditor who found multiple indications of fraud at Onward, Onward voluntarily surrendered its status as an eligible Medicare supplier in August 2009. Between March 2003 and July 2009, Onward had submitted 989 claims to Medicare totaling approximately $4,000,000, of which Medicare paid Onward approximately $2,000,000.

In order to submit a claim for reimbursement from Medicare for durable medical equipment, Onward needed a certificate of medical necessity and a prescription, signed by a physician. In 2008, John Nasky Okonkwo ("Okonkwo"), a co-defendant in this case, provided Vinitski/Onward with forged prescriptions for durable medical equipment. Okonkwo purchased the prescriptions, which were already signed with co-defendant Grant's name, from Dr. Joseph Edem ("Edem"), who owned Attentive Care Clinic in Houston. Okonkwo paid Edem $500 per motorized wheelchair prescription signed by a physician and $300 per signed prescription for orthotics. A first batch of ten to twelve prescriptions from Okonkwo arrived at Onward in late September or early October 2008.

Javonica Moten ("Moten") worked for Onward as an administrative assistant from August 2008 through January 2009 and was co-defendant Lee's live-in girlfriend during that time. Moten found out about the job opening at Onward through Lee because Lee, an electrician, knew Vinitski from electrical work he performed at Onward. When the first batch of prescriptions from Okonkwo arrived at Onward, Moten, who had seen Grant's signature before, told

No. 11-20013

Vinitski that the signature on the prescriptions did not look like Grant's actual signature. Moten spoke with Lee, who was friends with Grant, about the apparently forged prescriptions, and Lee told her Grant would come to see the prescriptions the following day. Grant met with Vinitski and confirmed the signatures on this batch of prescriptions were not his. Grant and Vinitski spoke after this first meeting and had dinner the following week, at which point Grant asked Vinitski for money "to redo the prescription order and sign it with his signature." A second set of prescriptions with Grant's forged signature arrived at Onward from Okonkwo about a month after the first set. Per Vinitski's request, Moten created lists of patients in both the first and second set of prescriptions for Grant.

Vinitski told Moten that co-defendant Nwankwo would deliver the equipment for the patients on the prescriptions Onward received from Okonkwo. Nwankwo made at least nine deliveries of equipment billed to Medicare using the prescriptions from Okonkwo. Nwankwo repeatedly delivered or attempted to deliver durable medical equipment to patients who were able to walk unassisted or who refused to take the equipment because they did not need it.

Moten informed Lee about the illegal practices at Onward, including that Onward used the forged prescriptions and that the beneficiaries Onward delivered equipment to were receiving equipment they did not need. However, even after Lee learned of the illegal activity at Onward, Moten testified that Lee still wanted to deliver durable medical equipment for Onward. To this end, Lee enrolled in a training class, paid for by Vinitski, in order to make deliveries for Vinitski. When Vinitski was looking for a way to pay Grant for redoing the forged prescriptions because she could not pay Grant directly, Lee suggested to Moten that he could serve as a third party through whom Vinitski could route her payments to Grant.

No. 11-20013

## DISCUSSION

A. Sufficiency of the evidence

This court reviews preserved challenges to the sufficiency of the evidence de novo. *United States v. McElwee*, 646 F.3d 328, 340 (5th Cir. 2011). The court will "view all evidence, whether circumstantial or direct, in the light most favorable to the government, with all reasonable inferences and credibility choices to be made in support of the jury's verdict," to determine whether "a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Ford*, 558 F.3d 371, 375 (5th Cir. 2009). The jury "retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses." *United States v. Loe*, 262 F.3d 427, 432 (5th Cir. 2001). "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt," in order to be sufficient. *United States v. Moreno*, 185 F.3d 465, 471 (5th Cir. 1999). However, the government "must do more than pile inference upon inference upon which to base a conspiracy charge." *United States v. Mackay*, 33 F.3d 489, 493 (5th Cir. 1994) (internal quotation marks omitted).

All three defendants appeal their convictions for conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349.[1] All three defendants filed Rule 29 motions for judgment of acquittal, which the district court denied on August 13, 2010. The district court's denial is detailed in a lengthy written order, specific to each defendant.

---

[1] Grant does not make any separate challenge to the two substantive health care fraud counts he was convicted of. Notably, the district court gave a *Pinkerton* instruction, telling the jury that if it found Grant guilty of conspiracy to commit health care fraud (Count 1), it could also hold him responsible for the two substantive health care fraud offenses (Counts 2 and 3) committed by other conspirators during the time that Grant was a member of the conspiracy. *See Pinkerton v. United States*, 328 U.S. 640 (1946).

No. 11-20013

To prove a conspiracy to commit health care fraud, the government must prove beyond a reasonable doubt that (1) two or more persons made an agreement to commit health care fraud; (2) that the defendant knew the unlawful purpose of the agreement; and (3) that the defendant joined in the agreement willfully, that is, with the intent to further the unlawful purpose. 18 U.S.C. §§ 1347, 1349; *United States v. Delgado*, 668 F.3d 219, 226 (5th Cir. 2012). The agreement between conspirators may be silent and need not be formal or spoken. *United States v. Williams-Hendricks*, 805 F.2d 496, 502 (5th Cir. 1994). "An agreement may be inferred from concert of action, voluntary participation may be inferred from a collection of circumstances, and knowledge may be inferred from surrounding circumstances." *United States v. Stephen*, 571 F.3d 401, 404 (5th Cir. 2009) (internal citations and quotation marks omitted).

1. Dr. Howard Grant[2]

Grant argues that the evidence was insufficient to prove that he "joined the conspiracy or executed a scheme to defraud either on his own or in concert with others." Grant argues that the government's "primary theory of prosecution" is that Grant joined the conspiracy by choosing not to report the illegal activity at Onward after he learned about it. The jury heard enough credible evidence, however, to determine that Grant's role was much more than a failure to report fraud; instead, Grant actively participated in the fraud.

Grant took the stand in his own defense. He acknowledged that the prescriptions would have been fraudulent regardless of whether they had his forged signature and regardless of whether he actually signed them because the prescriptions were for equipment that was not medically necessary for the beneficiaries. Testimony from Moten and Okonkwo showed that Grant himself

---

[2] Grant was sentenced to 41 months imprisonment followed by three years of supervised release and ordered to pay $121,742.62 in restitution to be paid jointly and severally with other defendants.

demanded payment for redoing prescriptions he knew to be fraudulent.[3]  For example, Vinitski said Grant was "asking for money to . . . redo the prescription order and sign it with his signature" for the forged prescriptions sent by Okonkwo and that "Dr. Grant wanted money to make those patients' prescriptions correct."  Vinitski also said that: (1) Grant knew what was going on and had demanded $10,000 to redo the prescriptions; (2)  she was going to pay Grant because "that's what Dr. Grant is demanding"; and (3) "she would need Dr. Grant to redo the paperwork when she had to pay him the money."  Okonkwo testified that Edem, the doctor from whom he obtained the prescriptions with Grant's forged signature, told him that he paid the doctors at Grant's medical facility $100 per durable medical equipment prescription.  The jury could reasonably infer that Grant expected to be paid for the prescriptions he admitted were fraudulent based on testimony that Grant told Vinitski that he had been "cheated . . . out of money for those prescriptions" by Edem.

Furthermore, Grant continued to speak on the phone repeatedly with Vinitski and Edem, even after he found out that Vinitski had bought prescriptions from Edem with Grant's forged signature.[4]  Grant testified that he had continued to talk to Vinitski and Edem in an effort to gather information for the *qui tam* lawsuit he was considering filing regarding the fraud.  However, as the district court held, the jury could reasonably have found that Grant's explanation for the phone calls was not credible considering that he provided

---

[3] Grant argues that multiple witnesses testified that Vinitski is not credible.  However, "[i]n assessing the sufficiency of the evidence, we do not evaluate the weight of the evidence or the credibility of witnesses, but view the evidence in the light most favorable to the verdict." *United States v. Doggins*, 633 F.3d 379, 383–84 (5th Cir. 2011) (internal quotations omitted).  Furthermore, as the district court noted, the jury's credibility determinations were reasonable because Grant gave the jury ample reason to doubt his own credibility.

[4] Grant spent 484 minutes (141 calls) on the phone with Vinitski and 73 minutes on the phone with Edem between November 2008 and January 2009.

false information about his relationship with Edem to the attorneys he contacted about filing the *qui tam* lawsuit.[5] *See Loe*, 262 F.3d at 432.

Grant also argues that because there was no proof that he received payment from the conspiracy, the evidence was insufficient to convict him of health care fraud. However, as the district court observed, neither the conspiracy nor the substantive counts with which Grant was charged required the government to prove that Grant benefitted financially from his participation in the health care fraud scheme. *See* 18 U.S.C. §§ 1349, 1347 and 2.

## 2. Obisike Nwankwo[6]

Nwankwo argues that there is insufficient evidence to tie him to the fraud at Onward, stating that the evidence shows that Nwankwo only found out about the fraud at Onward after his arrest and therefore could not have known about the unlawful purpose of his deliveries.[7] However, there was credible evidence presented at trial that Nwankwo knew that the equipment that he was paid to deliver was not medically necessary for the beneficiaries but delivered it anyway.[8]

---

[5] Additionally, as the district court observed, "[i]t is undisputed that Grant never filed a *qui tam* lawsuit. It is also undisputed that Grant never reported the Onward fraud to any person or agency connected with the Medicare program or to any law enforcement agency." The district court also noted, "[o]n cross-examination . . . Grant admitted that he did not want to file a *qui tam* lawsuit unless he could profit from it and unless he could file it without any expense to himself." Grant testified, "I wanted to make money" and, when asked, "Is there any other reason that you wanted to file this lawsuit?" Grant answered, "No."

[6] Nwankwo was sentenced to 21 months imprisonment followed by three years of supervised release and ordered to pay $29,057.70 in restitution to be paid jointly and severally with other defendants.

[7] Nwankwo also argues that Okonkwo, a co-defendant in the case, testified that Nwankwo "never knew nor had knowledge of the illegal activities." However, Okonkwo repeatedly also testified that he did not know whether Nwankwo knew of the conspiracy or knew that he was delivering unnecessary medical equipment.

[8] Nwankwo argues that, "[a]fter hearing the government's entire case over a period of six days and making a conscientious effort to examine the record in the light most favorable

No. 11-20013

The evidence shows that Nwankwo made at least nine deliveries of equipment ordered using the fraudulent prescriptions with Grant's forged signature. Moreover, Moten testified Vinitski liked Nwankwo to deliver durable medical equipment ordered through the forged prescriptions because Nwankwo knew "how to make the people take the equipment even if they don't want it" and knew "all the right things to say to make them keep it." Testimony at trial showed that Nwankwo made repeated attempts to deliver equipment that were unsuccessful because the patients refused to accept the delivery or did not live at the address provided.

Evidence presented at trial showed that Nwankwo knew that at least some of the equipment he was trying to get beneficiaries to accept was medically unnecessary. Nwankwo made two deliveries of motorized wheelchairs to Samuel Anderson and Lillie Brown, both of whom were able to walk and insisted they did not need the wheelchairs.[9] Lillie Brown even told Nwankwo that she "wasn't handicapped and that [her] doctor didn't prescribe [her] one" when Nwankwo unsuccessfully attempted to deliver a motorized wheelchair to her. In November 2008, Nwankwo also delivered a wheelchair to Stanley Butler, who could walk without assistance.

---

to the government, the court still had its doubts." However, the citation Nwankwo uses to support this contention actually refers to Judge Atlas's initial doubts about the case against Grant, not Nwankwo.

[9] Samuel Anderson testified that when he told Nwankwo he did not need the wheelchair, Nwankwo responded by trying to convince him to take it anyway and saying, "[you] can take it and put it in the house and if [you] ever needed it, it would be available." When Anderson replied that he still did not want the wheelchair, Nwankwo told him "maybe time you get ready for to use it, you might not be able to be qualified when you've been already approved and you can just take it at this time." When Lillie Brown told Nwankwo that she did not need a wheelchair," Nwankwo told her "[y]ou need one. Maybe you would like to order it." When Nwankwo would not leave her front step after she refused to let him in, Brown told him she would call the police.

No. 11-20013

Finally, there was evidence presented that Nwankwo signed delivery slips that were fraudulently back-dated to appear to conform to Medicare regulations that required durable medical equipment be delivered to the beneficiary before the provider billed Medicare. For example, Moten testified that Nwankwo signed a delivery ticket dated September 30, 2008 when he made the delivery in late November 2008. Nwankwo signed two forms relating to this November 2008 delivery, both of which included the incorrect date, "9-10-08," displayed prominently (once directly across from his signature and once directly above it). The jury reasonably could conclude that the fraudulent date was unmistakable to Nwankwo when he signed the forms at the subsequent November 23-25 delivery.

Nwankwo cites *United States v. Mackay*, 33 F.3d 489, 494 (5th Cir. 1994), to support his contention that the evidence is not sufficient to prove that he agreed to deliver fraudulent equipment. *See id.* at 494 ("evidence that the companion agreed to transport the backhoe does not prove that he agreed with Mackay to transport a *stolen* backhoe")). However, *Mackay* is factually distinguishable because in that case, there was no evidence that the companion (who was charged with conspiracy to transport stolen goods interstate) "knew the backhoe was stolen, let alone that he agreed to transport a stolen backhoe." *Id.* at 494. Here, Nwankwo agreed to and was paid $2,910 from December 2008 to May 2009 for making equipment deliveries for Onward and knew that beneficiaries, such as Samuel Anderson and Lillie Brown, did not need or want the equipment he was delivering and that their doctors had not prescribed it. Therefore, unlike in *Mackay*, where there was no evidence the companion knew anything about the nature of article he was transporting, the jury in this case could reasonably have inferred that Nwankwo agreed to deliver fraudulently prescribed and ordered durable medical equipment because he knew the

9

beneficiaries did not need or want the equipment and had not been prescribed the equipment by their doctors.

Nwankwo also intimates that the objective of the health care fraud conspiracy had been achieved before Nwankwo began making deliveries in December 2008. Nwankwo failed, however, to support this contention by explaining what "objective" of the conspiracy was accomplished by December 2008. Indeed, he does not develop this contention at all. In any event, there was evidence presented at trial that Nwankwo made a delivery of fraudulently prescribed equipment in late November 2008. Furthermore, the health care fraud could not have been completed without Nwankwo's delivery of the equipment ordered through the forged prescriptions because Medicare requires "proof of delivery and training and education [of the beneficiary] on a particular product or service."

3. Clinton Lee[10]

On appeal, Lee's "sole challenge is to the sufficiency of the evidence." However, there was evidence presented at trial that Lee became aware of the fraudulent prescriptions at Onward in October 2008 but wanted to deliver medical equipment for Vinitski anyway, thereby knowingly volunteering to join the conspiracy.

Moten testified that she informed Lee: (1) about the forged prescriptions used by Onward; (2) that Onward used marketers who received commissions for bringing in beneficiaries who purchased durable medical equipment; (3) that Onward billed Medicare and got paid for equipment that had not been delivered or ordered; and (4) that the beneficiaries Onward delivered equipment to were

---

[10] Lee was sentenced to three years probation, supervised release, and a special assessment.

receiving equipment they did not need.[11]  However, even after Lee learned of the illegal activity at Onward, Moten testified that Lee still wanted to deliver durable medical equipment for Onward.  Indeed, Lee enrolled in a training class, paid for by Vinitski, in order to make deliveries for Vinitski and told Moten that he was taking the class "[s]o he could learn how to set up equipment so he could do deliveries and know how to set it up."  Moten testified that Vinitski told her to go with Lee on the first delivery after he took the class so that Moten could teach Lee about the paperwork he needed to use during deliveries.  Moreover, Lee testified that he knew when he took the class that Onward's business "didn't appear to be right."[12]

Lee argues that the evidence against him is insufficient because: (1) he never made any fraudulent deliveries and (2) he never profited from the health care fraud as the only money he was paid by Vinitski was for electrical work he had done for Onward.  However, to prove conspiracy, the government is not required to prove that the accused profited from the conspiracy. *See Jackson*, 700 F.2d at 185 (explaining that to prove conspiracy, the government must "prove beyond a reasonable doubt that a conspiracy existed, that the accused knew of the conspiracy, and that he knowingly and voluntarily joined it").  Indeed, Moten testified that when Vinitski had not called Lee to do any deliveries, he was

[11] Lee argues that, "mere knowledge does not show that he joined into the conspiracy," relying on a trio of "dope house" cases: *United States v. Ocampo*, 964 F.2d 80, 82 (1st Cir. 1992); *United States v. Soto*, 716 F.2d 989, 991–93 (2d Cir. 1983); and *United States v. Hyson*, 721 F.2d 856, 862–63 (1st Cir. 1983).  We do not, however, hold that the fact that Lee was aware of the criminal activity at Onward is, alone, enough to prove he joined the conspiracy.

[12] Lee contends that the course he took dealt with the repair of motorized wheelchairs. However, the jury heard Moten's testimony and Lee's testimony and was shown Defendant's Exhibit 12, the course book for the class.  From that evidence, the jury was entitled to make necessary credibility determinations. *Loe*, 262 F.3d at 432 (5th Cir. 2001) (explaining that the jury "retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses.").  Furthermore, the jury's credibility determination was reasonable considering that Lee admitted after his arrest that Vinitski had "enrolled him in a training class for the installation and repair of . . . medical equipment."

frustrated and wondered "so why did she have him take the class" where he learned how to put together medical equipment.  After Lee's arrest, Lee told agents that he was interested in getting into the durable medical equipment business because people involved in that business were making a lot of money and everybody was "going to the government trough."

Moreover, Moten testified that Vinitski was looking for a way to pay Grant for redoing the forged prescriptions because she could not pay Grant directly and that Lee suggested to Moten that he could serve as a third party through whom Vinitski could route her payments to Grant.  Lee argues that Moten's testimony about the possibility of forming a company to facilitate payment of Grant for the prescriptions Lee knew were forged "is of no moment" because there is no evidence that Lee ever contacted Grant about the possibility or took any other steps.  However, Lee's suggestion that he could help funnel the payments when he already knew the activity was illegal certainly provides evidence that Lee knowingly and willingly (even if unprofitably) sought to participate in the fraud.

Finally, Lee's numerous telephone conversations with Vinitski between October 2008 and February 2009 could reasonably have led the jury to infer that Lee's relationship with Vinitski was more than that of an occasional electrician (the relationship Lee claims).[13]  Lee argues that the mere association with conspirators will not support an inference of participation in a conspiracy. However, this court has held that "even minor participation in the conspiracy may serve as the basis for a conviction" and that a defendant's "[v]oluntary

---

[13] Lee called Vinitski 141 times and talked for 816 minutes; Vinitski called Lee 101 times and talked for 1,017 minutes.  When Lee was asked what he spoke with Vinitski about during late November/December, he answered "[w]e talked about electrical stuff there at the office, we talked about stuff there, phone, we talked about her daughter, Kimberly, we talked about her Internet not working right at her house, and just pretty much everything."  No other evidence was presented about the topics of conversation during the phone calls between Lee and Vinitski.  Lee also called Grant 58 times for a total of 145 minutes and Grant called Lee 94 times totaling 747 minutes.

participation may be inferred from a collocation of circumstances." *United States v. Bieganowski*, 313 F.3d 264, 277 (5th Cir. 2002) (internal citations and quotation marks omitted).

B. Admission of Vinitski's statements under Fed. R. Evid. 801(d)(2)(E)

This court reviews the district court's admission of Vinitski's statements for plain error because Grant failed to object below to the admission of the statements under Federal Rule of Evidence 802(d)(2)(E). *See* Fed. R. Crim. P. 52(b); *United States v. Burton*, 126 F.3d 666, 673 (5th Cir. 1997).  Plain error requires: (1) error; (2) that is clear or obvious; (3) that affects substantial rights; and (4) if those elements are satisfied, the court of appeals may exercise its discretion to remedy the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Puckett v. United States*, 129 S.Ct. 1423, 1429 (2009).

Grant argues that Vinitski's out-of-court statements, elicited through the testimony at trial of Okonkwo and Moten, are hearsay, and therefore not admissible. *See* Fed. R. Evid. 802.  Appellees argue that Vinitski's statements are admissible because they are not hearsay under Federal Rule of Evidence 801(d)(2)(E).  Under Rule 801(d)(2)(E), an out-of-court statement offered against a party is not hearsay and is therefore admissible, if it was made "by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E) (as restyled, effective Dec. 1, 2011).  The statements at issue concern Vinitski's plan to deal with the forged prescriptions by paying Grant the money he demanded to redo them, as well as possible arrangements for making payment to Grant through a third party, Lee.[14]

---

[14] The statements Grant contends were inadmissible include: (1) Okonkwo's testimony that Vinitski told him Grant was demanding Vinitski pay him $10,000 "to redo the paperwork" on the prescriptions with Grant's forged signature; (2) Okonkwo's testimony that Vinitski told him she was going to pay $10,000 to Grant; (3) Moten's testimony that Vinitski told her Grant asked for money in exchange for fixing the prescriptions with Grant's forged signature; (4)

No. 11-20013

Grant contends that Vinitski's statements were not in furtherance of the conspiracy because they "can be characterized as mere hand-wringing." However, "[s]tatements regarding the payment of money for services rendered in accomplishing the illegal goals of a conspiracy can be considered to be 'in the course and in furtherance of the conspiracy.'" *United States v. Garcia*, 995 F.2d 556, 561 (5th Cir. 1993). Therefore, statements involving the payment of Grant for redoing the forged fraudulent prescriptions are in furtherance of the conspiracy to commit health care fraud.

Grant also contends that Vinitski's statements could not have been made during and in furtherance of the conspiracy because the statements were made after the objective of the conspiracy, to receive money from Medicare based on fraudulent prescriptions for durable medical equipment, had already been accomplished. Grant contends that, "Onward received the second set of prescriptions along with the government payment in early to mid November [2008]." However, Onward did not bill Medicare for the second set of forged prescriptions (with Grant's forged signature) until November 25, 2008. It is reasonable to believe that Onward would not have received full payment by early December for claims that were not even submitted until November 25. Furthermore, the government alleged a conspiracy that continued until 2009[15] and included as one of its objectives "concealing the submission of false and fraudulent claims to Medicare and the receipt and transfer of the proceeds from the fraud."

---

Moten's testimony that Okonkwo told Vinitski that Grant had already been paid for the prescriptions; and (5) Moten's testimony that Vinitski asked her whether Lee would be willing to accept Vinitski's payments to Grant on Grant's behalf.

[15] The government contended at oral argument that the end of the conspiracy was March 31, 2009, the date of the last phone call between Grant and Vinitski. We also note that Onward did not voluntarily surrender its status as an eligible Medicare supplier until August 2009.

14

No. 11-20013

Regardless, this court has held that, "[e]fforts to conceal an ongoing conspiracy obviously can further the conspiracy by assuring that the conspirators will not be revealed and the conspiracy brought to an end." *United States v. Phillips*, 219 F.3d 404, 419 (5th Cir. 2000) (citations omitted); *see United States v. Broussard*, 80 F.3d 1025, 1039 (5th Cir. 1996) ("Given that concealment is often a necessary part of a conspiracy, statements made to aid the concealment are made in furtherance of the conspiracy.").[16]    Vinitski's statements showing that Grant was asking for $10,000 to redo the forged prescriptions in late November or early December 2008 were made to aid the concealment of the conspiracy.  Therefore, the district court did not plainly err by considering Vinitski's out-of-court statements regarding Grant's payment for forged prescriptions to have been statements made during and in furtherance of the conspiracy. *United States v. Burton*, 126 F.3d 666, 674–75 (5th Cir. 1997) (explaining that the admission of a statement under the co-conspirator hearsay provision was not plain error where it was not "clear" or "obvious" that the statement was not made in furtherance of the conspiracy)*; see United States v. Trejo*, 610 F.3d 308, 319 (5th Cir. 2010) ("Plain error is error so clear or obvious that the trial judge and prosecutor were derelict in countenancing it, even absent the defendants' timely assistance in detecting it.") (internal quotation marks omitted).

---

[16] Grant relies on *Krulewitch v. United States*, 336 U.S. 440 (1949), and Justice Jackson's concurrence in *Grunewald v. United States*, 353 U.S. 391 (1957), to argue that Vinitski's statements were not in furtherance of the conspiracy because they involve agreements among conspirators only to avoid detection.  Both *Grunewald* and *Krulewitch*, however, involve "desperate attempts to cover up *after the crime begins to come to light*." *Grunewald*, 353 U.S. at 403 (Jackson, J., concurring) (emphasis added); *see Krulewitch*, 336 U.S. at 444 (holding that a statement "made in furtherance of an alleged implied but uncharged conspiracy aimed at preventing detection and punishment" is not admissible.  Here, Vinitski's statements did not involve covering up a conspiracy that was already over or that was already being investigated; instead, Vinitski's statements involved the payment of Grant for his part in the conspiracy (the writing of fraudulent durable medical equipment prescriptions for submission to Medicare).

C. Prosecutorial misconduct

Grant argues that the government's second cross-examination of him constituted prosecutorial misconduct.

"Improper prosecutorial comments constitute reversible error only where the defendant's right to a fair trial is substantially affected." *United States v. Stephens*, 571 F.3d 401, 407–08 (5th Cir. 2009) (quoting *United States v. Holmes*, 406 F.3d 337, 355–56 (5th Cir. 2005)).   To analyze claims of prosecutorial misconduct, this court first considers "whether the prosecutor made an improper remark," and, if so, "ask[s] whether the defendant was prejudiced." *Id.* at 408 (quoting *United States v. Fields*, 483 F.3d 313, 358 (5th Cir. 2007)).

On May 26, 2010, Grant testified and the government cross-examined him about his Medicare billing for overseeing nurses who visited home health care patients.  Grant admitted that he had submitted bills for three patients after the patients had died.  Later, on June 1, 2010, Grant moved to reopen his case so that he could offer an explanation for this billing.  Grant's counsel explained that Medicare regulations permit a physician to bill for oversight services during a 60-day "certification period" after seeing the patient at the beginning of the period and that "only after notification of death . . . would he not thereafter be permitted to bill."  The district court granted the motion to reopen.

During the government's second cross-examination of Grant, the prosecutor reasonably elicited information from Grant regarding his compliance with Medicare's billing requirements for oversight services.  Specifically, the prosecutor questioned Grant regarding a letter, found in Grant's patient records, that a home health care agency had sent to his office dated May 4, 2009, notifying him that patient Jesse Clay had died, and Grant's subsequent submission of two bills for oversight services after the date of the letter (on May 15, 2009 and June 13, 2009).  The prosecutor also questioned Grant about the

incomplete records he maintained for Clyde Grice, a patient for whom Grant had billed Medicare for oversight services after the patient's death.

Grant argues that, "the government had no good faith basis for accusing Dr. Grant of improperly billing for the dead patients." However, the prosecutor's cross-examination appropriately drew the jury's attention to (1) Grant's billing for services rendered to Jesse Clay two times after the date of the letter in Grant's patient records notifying Grant of her death; (2) Grant's lack of knowledge about how long he had been overseeing the three patients in question (Grice, Clay, and Collins), what their medical problems were, or how they died; and (3) the incomplete records maintained for Clyde Grice and past accusations that Grant had failed to maintain adequate medical records. The government's cross-examination was not aimed at proving that the Grant violated accepted Medicare billing practices solely by billing for oversight services rendered after patients' deaths; instead, it was aimed at showing Grant's knowledge and intent inasmuch as he billed Medicare after he was notified Jesse Clay died and that Grant's incomplete medical records facilitated incorrect billing.[17]

"In the context of cross-examination, no misconduct can arise for a question asked for a valid reason." *United States v. Munoz*, 150 F.3d 401, 414 (5th Cir. 1998). Therefore, the government's cross-examination of Grant did not constitute reversible prosecutorial misconduct.

D. Missing witness instruction

Generally, we review a district court's failure to provide a requested jury instruction "under an abuse of discretion standard, affording the trial court substantial latitude in describing the law to the jurors." *United States v. Rios*, 636 F.3d 168, 171 (5th Cir. 2011) (quoting *United States v. Santos*, 589 F.3d 759,

---

[17] Because the prosecutor's cross-examination in this case was not improper, we need not reach whether "the defendant's right to a fair trial [was] substantially affected." *See Stephens*, 571 F.3d at 407–08 (citing *Holmes*, 406 F.3d at 355–56).

764 (5th Cir. 2009)). "A district court should not grant a missing witness instruction unless the individual (1) is peculiarly within one party's power to produce, and (2) would provide testimony that will elucidate facts at issue." *Id.*

Grant focuses on the first part of this test, arguing that the district court's failure to provide the requested missing witness instruction was an abuse of discretion because Vinitski was "'peculiarly within the power' of the government to call as a witness." To support this contention, Grant notes that Vinitski had pled guilty and was awaiting sentencing. Grant argues that "while subject to being subpoenaed by the defense, she certainly would have refused to testify for the defense," referencing a probability that Vinitski would have invoked her Fifth Amendment right not to testify.

We have examined the consensus of caselaw, however, that holds that a co-conspirator who pleads guilty and is awaiting sentencing is not peculiarly within the government's control so as to justify a missing witness instruction. *Rios*, 636 F.3d at 172 (affirming a district court's denial of a missing witness instruction and holding that "the government's failure to grant immunity to a witness who invokes the Fifth Amendment right not to testify does not by itself entitle a defendant to a missing witness instruction.").[18] Here, Vinitski was not called by either party, so it is not clear whether she would have invoked her Fifth Amendment right had the defense chosen to call her, nor is it clear whether the government would have refused to grant her immunity. Grant has provided no other support for why he could not have called Vinitski as a witness himself.

---

[18] This court explained in *Rios* that, "[t]he Fifth Circuit has yet to address whether a witness who relies upon his or her constitutional right not to testify is peculiarly within the government's control. Every circuit that has considered the question, though, has held that the government's ability to grant immunity does not make a witness who invokes the Fifth Amendment right not to testify peculiarly available to the government." *Rios*, 636 F.3d at 171 (internal citations omitted).

No. 11-20013

Therefore, Grant has not proven that Vinitski was peculiarly within the control of the government. *Id.*[19]

Moreover, the government's decision not to call Vinitski as a witness was already addressed in the jury instructions. The district court instructed jurors that, "[t]he law does not require the prosecution to call as witnesses all persons . . . who may appear to have some knowledge of the matters at issue at this trial . . . . However, in judging the credibility of the witnesses who have testified and in considering the weight and effect of all the evidence that has been produced, the jury may consider the prosecution's failure to call other witnesses or to produce other evidence shown by the evidence to be in existence and available." Therefore, the district court did not abuse its discretion by refusing to elaborate with a missing witness instruction.

## CONCLUSION

We conclude that: (1) the district court did not plainly err by admitting Vinitski's statements; (2) the government's second cross-examination of Dr. Grant was not reversible prosecutorial misconduct; (3) the district court did not abuse its discretion by refusing to elaborate with a missing witness instruction; and (4) there was proof enough to support the Defendants-Appellants' convictions. Therefore, we AFFIRM the convictions of Grant, Nwankwo, and Lee.

---

[19] Grant emphasizes the non-dispositive language in *Rios* by stating, "*Rios* states that 'the government's failure to grant immunity to a witness who invokes the Fifth Amendment right not to testify does not by itself entitle a defendant to a missing witness instruction.'" Grant argues that "a combination of factors . . . justified the missing witness charge." However, *Rios* only contemplates two exceptional circumstances which, combined with the government's failure to grant immunity to a witness who invokes the Fifth Amendment, might merit a missing witness instruction: "Some circuits have provided an exception where there is a substantial showing of an abuse of prosecutorial discretion or where circumstances indicate that the witness would have been exculpatory." *Rios*, 636 F.3d at 172. Grant does not claim either of these exceptional circumstances is present here. *See Rios*, 636 F.3d at 172 ("[Defendant] does not argue prosecutorial abuse of discretion, so we need not consider whether exceptions apply.").