# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-51334

United States Court of Appeals
Fifth Circuit

**FILED**

April 26, 2016

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

      Plaintiff - Appellee

v.

SALLY BARRAZA-MENA, also known as Sally Mena-Barraza,

      Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas
USDC No. 3:13-CR-1726-18

Before STEWART, Chief Judge, and JONES, and DENNIS, Circuit Judges.

PER CURIAM:*

In this direct criminal appeal, Sally Barraza-Mena challenges her conviction for conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h). Finding no reversible error, we affirm her conviction.

## I.

Barraza-Mena's prosecution arises from a federal law enforcement investigation into a drug-trafficking operation run by Manuel Velasquez.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-51334

According to the evidence presented at Barraza-Mena's trial, Velasquez specialized in transporting marijuana from Mexico into the United States by way of El Paso. Once in the United States, co-conspirators moved the marijuana north utilizing both car haulers and motors homes. Co-conspirators would then ship money back to El Paso so that it could be transported across the border to Juarez, Mexico. According to one co-conspirator, some of these money shipments contained as much as $750,000.

On August 15, 2012, Velasquez's associates in El Paso received a shipment of money from Kansas in the amount of $25,000. A co-conspirator named Jose Antonio Cabral-Espinoza, who testified at trial, divided the money amongst three women who were then instructed to take the money across the border to Juarez. One of these women, Laura Nunez, was given $8,000 to take through the Paso Del Norte port of entry into Juarez. Cabral-Espinoza told Nunez that if authorities asked her any questions about the money, she should "tell them that the money was for a stationwagon, van, Pacifica, that she had seen on a lot, and to say that that vehicle wasn't at the lot anymore."[1]

As Nunez was crossing the bridge to Juarez, an agent with the U.S. Customs and Border Protection ("Customs"), Albert Sanchez, stopped Nunez for an inspection after observing that she was clenching her purse close to her body. When asked about the source of the $8,000 in her purse, Nunez told Sanchez that the money was from the sale of two vehicles and that the rest of the money had come from a loan. However, Nunez was unable to provide details about the cars such as their make, model, or color. Upon further questioning, Nunez eventually admitted that the money did not come from the

[1] At trial, various law enforcement officials explained that there was an ongoing "trend" of individuals providing similar stories about failed attempts to purchase cars in the United States when explaining why they were crossing the border with large sums of cash.

2

sale of cars or a loan. Rather, Nunez explained to the agents that someone had given her the money just before she crossed the bridge and told her that she would be paid in return for transporting it across the border. Agent Sanchez then formally seized the money but allowed Nunez to cross the border. Nunez was also provided with information about petitioning Customs for the return of the $8,000. As explained at trial, in order to have such seized money returned, an individual must complete a petition in English showing that the money was not obtained by illegal means.

Enter Barraza-Mena, who worked as a licensed notary in El Paso and whose brother had previously been Velasquez's defense lawyer in a drug distribution prosecution. On the day following the seizure, Velasquez spoke with Barraza-Mena and explained to her what had happened with Nunez on the bridge. After convincing Barraza-Mena to help obtain the return of the seized money, Velasquez called Cabral-Espinoza and instructed him to take Nunez to Barraza-Mena's office in order to have the Customs petition notarized and to obtain her assistance with completing the petition. Cabral-Espinoza complied. As Cabral-Espinoza testified at trial, while at Barraza-Mena's office, Nunez provided her with details about what had happened at the bridge "with the understanding that they had to come up with an idea as to how to get the money back." Barraza-Mena then assisted Nunez in drafting and ultimately notarized the Customs petition. The petition stated that the $8,000 was "going to be used to purchase a 2008 Chrysler Pacifica vehicle," but that when Nunez went to the dealership, the vehicle had been sold. It further stated that "[t]he money was not related to any violation of the controlled substances act." Although Cabral-Espinoza testified that neither he nor Nunez expressly mentioned at this meeting that the $8,000 was from marijuana trafficking, Cabral-Espinoza also testified that Barraza-Mena knew this was drug money and that Nunez's story about purchasing a car was a lie. Further, although

No. 14-51334

the petition provided that Nunez's address was in El Paso, Cabral-Espinoza testified at trial that Nunez told Barraza-Mena that she actually lived in Juarez.  On the day following their meeting, Nunez crossed the border back into El Paso and then paid Barraza-Mena $500 for notarizing the petition.  At trial, a witness from the Texas Secretary of State's Office explained that the standard fee for notarizing a single document is $6.

Subsequently, on September 10, 2012, Barraza-Mena notarized a Customs currency form for Nunez as part of the effort to reclaim the $8,000.  This was also done at Velasquez's direction.  Attached to this form were two sales contracts in Spanish with English translations.  The contracts stated that Nunez sold a Ford for $3,250 on August 4, 2012, and a Chrysler for $4,250 on July 20, 2012.  Barraza-Mena notarized both translations on September 18, 2012, and stated that she had translated the originals from Spanish to English.  At trial, Cabral-Espinoza explained that these contracts represented a "faked [ ] purchase and sale so they could justify the money."

Ultimately, the government agreed to return the money to Nunez despite the fact that it was related to an ongoing investigation.  Prior to returning the money, however, the government required Nunez to sign and notarize a hold harmless agreement affirming that she would not seek further remuneration from the government in connection with the seizure.  Velasquez thereafter spoke with Barraza-Mena about the need to notarize the hold harmless agreement.  On December 19, 2012, Velasquez called Cabral-Espinoza and instructed him to take Nunez to Barraza-Mena's office to obtain the requisite notarization.  As reflected in a recorded telephone call from this date introduced at trial, Velasquez explained to Cabral-Espinoza that this is "what they paid for," referring to the $500 fee paid to Barraza-Mena.

Pursuant to Velasquez's instructions, Barraza-Mena listed Nunez's address on the hold harmless agreement as Cabral-Espinoza's address in El

4

No. 14-51334

Paso rather Nunez's actual address in Juarez. In doing so, however, Barraza-Mena neglected to include Cabral-Espinoza's apartment number. After this omission came to light, Barraza-Mena told Cabral-Espinoza (in an intercepted telephone call also introduced at trial) to call Customs with the correct address and tell them that he was Nunez's brother—which was not true. She further advised Cabral-Espinoza to call Nunez first in order to confirm her brother's name so that they could "be on the same page." In the same call, Barraza-Mena asked Cabral-Espinoza: "And did you tell Manny [Velasquez] if he's going to send me a little gift or not?" Consistent with Barraza-Mena's instructions, Cabral-Espinoza subsequently called Customs, falsely identified himself as Nunez's brother, and explained that the apartment number had been omitted on the hold harmless agreement.

On August 15, 2013, agents with the Drug Enforcement Agency (DEA) arrested Barraza-Mena at her home. The arrest warrant listed the charges against Barraza-Mena as conspiracy to launder monetary instruments and conspiracy to possess with intent to distribute marijuana; however, the warrant did not list any other individuals who were arrested in connection with the investigation. Approximately half an hour after her arrest, Barraza-Mena spontaneously asked the DEA agents "if this was about Velasquez." At the time, the agents were neither questioning Barraza-Mena nor otherwise soliciting information from her.

In addition, DEA agents conducted a search of Barraza-Mena's office where they uncovered "at least three" notary books. During trial, a witness from the Texas Secretary of State's Office explained that notaries are required under statute to preserve a record book "for the longer of the term of the commission where the notarization occurred or three years following the date of the notarization." However, a review of the notary books seized from Barraza-Mena's office did not have any documentation reflecting that Barraza-

5

No. 14-51334

Mena had notarized documents in connection with reclaiming the seized $8,000.

Following a five-day trial, the jury convicted Barraza-Mena of conspiracy to launder money in violation of 18 U.S.C. §§ 1956(a)(2)(A), (B)(i), & (h), but acquitted her of conspiracy to possess with intent to distribute marijuana. Barraza-Mena thereafter filed a motion for acquittal under Rule 29(a) of the Federal Rules of Criminal Procedure ("Rule 29 Motion"), which the district court denied in an eleven-page order. The district court sentenced Barraza-Mena to five years of probation, which included six months in a home confinement program, and also ordered her to pay a $2,000 fine. This appeal followed.

## II.

Barraza-Mena first argues that her conviction must be set aside because, in her view, Texas notaries are categorically immunized from criminal liability based on notarizing written instruments that contain the false statements of others. According to Barraza-Mena, she "only notarized" the Customs petitions for Nunez and did not swear to the facts contained therein, thus rendering her conviction unlawful. This argument, however, rests on a premise belied by the facts of this case and the law of this court.

The jury convicted Barraza-Mena of knowingly conspiring to launder monetary instruments, which required it to find beyond a reasonable doubt "(1) that there was an agreement between two or more persons to commit money laundering and (2) that [Barraza-Mena] joined the agreement knowing its purpose and with the intent to further the illegal purpose." *United States v. Fuchs*, 467 F.3d 889, 906 (5th Cir. 2006). In other words, in order to convict Barraza-Mena, the jury was required to find far more than the fact that she simply notarized the documents at issue: it was required to find that she possessed the requisite knowledge and intent to join the conspiracy and to

further its unlawful purpose.  As we explain in Section IV below, the evidence presented at trial amply supports such a finding by the jury in this case.  Thus, while we do not dispute that there could be a case where a money-laundering conviction could not be premised *solely* on evidence that the defendant notarized a document without more, this is not that case.  In sum, the jury here supportably found that Barraza-Mena was a co-conspirator—not a mere scrivener.

Moreover, our own precedent reveals another fatal flaw in Barraza-Mena's argument.  As the government accurately notes in its brief, we have previously upheld the convictions of notaries when their duties have intertwined with criminal wrongdoing.  *See, e.g., United States v. Nguyen*, 493 F.3d 613, 617 (5th Cir. 2007); *Adams v. United States*, 156 F.2d 271, 273-74 (5th Cir. 1946).  Barraza-Mena provides no persuasive reason explaining why these precedents do not foreclose her novel theory of "notary immunity." Accordingly, we reject the argument and thus proceed to examine her other challenges on appeal.

### III.

Barraza-Mena next argues that her conviction must be vacated because the government's conduct was so "outrageous" as to constitute a violation of her rights to due process.  In short, she avers that because Customs agents allegedly knew the $8,000 constituted drug money, they acted improperly by instructing Nunez on how to submit petitions for the money's return.  As the parties agree, we review this issue for plain error because Barraza-Mena failed to raise it in the district court.  *See United States v. Sandlin*, 589 F.3d 749, 758 (5th Cir. 2009) (reviewing for plain error a claim of outrageous government conduct not raised at trial).

"The standard for proving outrageous government conduct is extremely demanding," and will be satisfied in only the "rarest" of circumstances. *Id.* at

758-59. The standard "becomes even more difficult to meet" where, as here, our review is for plain error. *Id.* "Government misconduct does not mandate dismissal of an indictment unless it is so outrageous that it violates the principle of fundamental fairness under the due process clause of the Fifth Amendment." *United States v. Gutierrez*, 343 F.3d 415, 421 (5th Cir. 2003) (quoting *United States v. Johnson*, 68 F.3d 899, 902 (5th Cir. 1995)). "Accordingly a defendant claiming outrageous government conduct bears 'an extremely high burden of proof,' and must demonstrate, in light of the totality of the circumstances, both substantial government involvement in the offense and a passive role by the defendant." *Id.* (quoting *United States v. Asibor*, 109 F.3d 1023, 1039 (5th Cir. 1997)). "The requirement that the defendant play only a passive role means that '[a] defendant who actively participates in the crime may not avail himself of the defense.'" *Id.* (quoting *United States v. Evans*, 941 F.2d 267, 271 (5th Cir. 1991)).

Applying these principles to the instant case, we conclude that the district court did not commit plain error in failing to *sua sponte* dismiss the indictment for outrageous government conduct. As an initial matter, the record here does not reflect "substantial government involvement in the offense" at issue. Nunez was "randomly" selected for inspection by Customs officials as she was attempting to transport the $8,000 across the border, and Barraza-Mena fails to point to any persuasive evidence in the record showing that Customs agents actually coached Nunez into involving Barraza-Mena in the conspiracy. Although Barraza-Mena emphasizes that Customs agents purportedly knew that the $8,000 was under investigation when they allowed Nunez to reclaim the money upon filing a hold harmless agreement, the evidence nevertheless shows that Barraza-Mena had already met multiple times with Velasquez's associates by this point and substantially assisted with efforts to repossess the funds. Contrary to Barraza-Mena's argument, we

8

previously have rejected similar due process claims where the government's conduct was significantly less attenuated from the criminal conduct at issue. *See, e.g., United States v. Tobias*, 662 F.2d 381, 386-87 (5th Cir. 1991) (rejecting due process claim where federal law enforcement placed an advertisement that marketed the ingredients to make PCP and thereafter gave advice to defendant on how to produce the drug).

Likewise, Barraza-Mena has not shown that she played only a "passive role" in the conspiracy to commit money laundering. Barraza-Mena met with Cabral-Espinoza and Nunez on multiple occasions in order to complete the documentation necessary to repossess the $8,000. She also spoke with Velasquez multiple times about these efforts. As Cabral-Espinoza explained at trial, rather than simply notarizing the documents at issue, Barraza-Mena helped Velasquez and his associates "come up with an idea as to how to get the money back," and some of their meetings lasted far longer than the amount of time that it would reasonably take to simply notarize a document. Further, although notaries are generally only paid $6 for notarizing documents, Barraza-Mena ultimately was paid $500, and even requested that Velasquez send her another "little gift." Moreover, as explained above, Barraza-Mena also instructed Cabral-Espinoza to lie to Customs agents about his identity in order to reclaim the money. In light of this evidence, we cannot say that Barraza-Mena played only a "passive role" in the offense. Accordingly, we reject her due process claim.

**IV.**

Barraza-Mena next contends that the evidence at trial was insufficient to convict her of conspiracy to commit money laundering. Because Barraza-Mena properly preserved her sufficiency challenge, we review *de novo* the denial of her Rule 29 Motion. *See United States v. Daniels*, 723 F.3d 562, 569 (5th Cir. 2013). "[T]he relevant question is whether, after viewing the evidence

in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "All reasonable inferences from the evidence must be construed in favor of the jury verdict." *United States v. Akpan*, 407 F.3d 360, 370 (5th Cir. 2005) (internal quotation marks and citation omitted). "The jury retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses." *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012) (internal quotations marks and citation omitted). In order to be sufficient, "'[t]he evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *Id.* (internal quotation marks and citation omitted).

As explained above, in order to convict Barraza-Mena of conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h), the government had to prove beyond a reasonable doubt "(1) that there was an agreement between two or more persons to commit money laundering and (2) that [Barraza-Mena] joined the agreement knowing its purpose and with the intent to further the illegal purpose." *Fuchs*, 467 F.3d at 906. "Direct evidence of a conspiracy is unnecessary; each element may be inferred from circumstantial evidence." *United States v. Delgado*, 668 F.3d 219, 226 (5th Cir. 2012) (internal quotation marks and citation omitted). Where a conspiracy has multiple objects, "[e]ven if there was insufficient evidence as to one of the objects of the conspiracy, we will nonetheless uphold the conspiracy conviction if there was sufficient evidence as to the object of the other." *Fuchs*, 467 F.3d at 906. "However, there is insufficient evidence of a conspiracy if the Government has only piled inference upon inference upon which to base a

conspiracy charge." *United States v. Umawa Oke Imo*, 739 F.3d 226, 235 (5th Cir. 2014) (internal quotation marks and citation omitted).

The indictment alleged that the object of the conspiracy was to transport, transmit, and transfer or attempt to transport, transmit and transfer monetary instruments from the United States to Mexico with either (1) the intent to promote marijuana trafficking or (2) knowing the monetary instruments involved in the transportation or transfer represented the proceeds of some form of unlawful activity and knowing that such transportation and transfer was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds in violation of 18 U.S.C. § 1956(a)(2)(A) & (B)(i).

After carefully reviewing the record, pertinent case law, and the parties' respective briefs, we conclude that there was sufficient evidence to sustain Barraza-Mena's conviction.  At trial, Cabral-Espinoza testified in detail not only about Velasquez's drug operation but also about the agreement between Velasquez and himself to transport the $8,000 of drug money into Mexico and to conceal its unlawful origins from Customs.  Although Cabral-Espinoza was a cooperating witness, the jury was free to credit his testimony. *See United States v. Shoemaker*, 746 F.3d 614, 623 (5th Cir. 2014) (observing that "a conviction may be based even on uncorroborated testimony of an accomplice or of someone making a plea bargain with the government, provided that the testimony is not incredible or otherwise insubstantial on its face." (internal quotation marks and citation omitted)).

Further, there was ample evidence presented at trial showing that Barraza-Mena possessed the requisite knowledge and intent to join the conspiracy and to further its unlawful purpose by assisting Velasquez and his associates in transporting the money across the border and concealing its unlawful origins.  Cabral-Espinoza testified that Barraza-Mena knew the

$8,000 represented drug money and also knew that the story Nunez told her about the vehicles was a lie. This testimony is consistent with other evidence showing that Barraza-Mena knew of and ignored other lies related to efforts to reclaim the $8,000. For example, although Barraza-Mena knew that Nunez lived in Juarez, she nevertheless provided an address in El Paso on the Customs documents. Likewise, as the recorded calls introduced at trial show, Barraza-Mena encouraged Cabral-Espinoza to lie to Customs agents by telling them that he was Nunez's brother and even instructed Cabral-Espinoza to confirm Nunez's brother's name so everyone was "on the same page."

In addition, there was a significant amount of circumstantial evidence presented at trial on which the jury supportably could rely in finding Barraza-Mena guilty. For example, Barraza-Mena was paid $500 for notarizing only a few documents despite the fact that notaries in Texas are generally paid only $6 per document, and she even requested that Velasquez give her another "little gift" for her assistance. Moreover, Velasquez had to "convince" Barraza-Mena for her assistance in reclaiming the money, which a reasonable juror could conclude shows that Barraza-Mena knew she was doing far more than merely notarizing documents. Considered along with the other evidence presented at trial, a reasonable juror could likewise infer guilt from the evidence showing that none of the record books seized from Barraza-Mena's office document her notarization of the Customs documents—despite Texas law requiring her to preserve those records. In sum, we conclude that the government presented sufficient evidence for the jury to convict Barraza-Mena of conspiracy to commit money laundering. Accordingly, the district court did not err in denying her Rule 29 Motion.

## V.

In her final issue on appeal, Barraza-Mena contends that the statute under which she was convicted, 18 U.S.C. § 1956(h), is unconstitutional as

applied to her conduct under the void-for-vagueness doctrine. "[T]he void-for-vagueness doctrine requires only that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Cavalier*, 17 F.3d 90, 93 (5th Cir. 1994) (summarily rejecting defendant's as-applied challenge to 18 U.S.C. § 1956). Because she failed to raise this constitutional challenge before the district court, we review the issue for plain error only. *United States v. Conlan*, 786 F.3d 380, 385-86 (5th Cir. 2015).

Barraza-Mena's vagueness challenge rests on the false premise that she simply notarized the documents at issue without knowledge or intent to join and further the money-laundering conspiracy. According to her, because she "merely" assisted in the preparation of the Customs petition by notarizing the documents, the criminal statute does not provide "fair notice" of what conduct is criminal in circumstances like her own. Once again, Barraza-Mena's argument fails because it erroneously trivializes her role in the offense. As explained above, in order to convict her, the jury was required to find that she *knowingly* joined the conspiracy and *intended* to further its unlawful purpose. *Fuchs*, 467 F.3d at 906. As the Supreme Court has long observed, such "scienter requirements alleviate vagueness concerns." *Gonzalez v. Carhart*, 550 U.S. 124, 149 (2007). Accordingly, we perceive no plain error in the district court's failure to dismiss the indictment on void-for-vagueness grounds.

## VI.

For these reasons, we AFFIRM Barraza-Mena's conviction.

13