# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 27, 2025

Lyle W. Cayce
Clerk

No. 22-10271

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

BART WADE REAGOR,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 2:21-CR-25-1

Before STEWART, RICHMAN, and HAYNES, *Circuit Judges*.

PRISCILLA RICHMAN, *Circuit Judge*:[*]

A jury found Bart Wade Reagor made a false statement to a bank in violation of 18 U.S.C. § 1014. He contends, as he did at trial by motions for a judgment of acquittal, that the Government did not present sufficient evidence to prove that Reagor knowingly made a false statement. Because there was sufficient evidence to support the jury's verdict, we affirm.

---

[*] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

No. 22-10271

## I

Reagor founded and was the CEO of Reagor-Dykes Auto Group (RDAG), a group of automotive entities with approximately twenty service and sales locations.  After an audit revealed that RDAG was in a weak cash position, RDAG sought a working capital loan from the International Bank of Commerce (IBC).  IBC employees met with Reagor and other RDAG employees to discuss the loan.  Shortly after the meeting, IBC drafted a loan memorandum, which stated that "[t]he entirety of the proposed $10,000,000 equity term loan will be used to inject equity . . . into the various entities underneath the [RDAG] umbrella" that were operating with insufficient capital due to extreme growth.  The memorandum also stated that the "[o]wners have eliminated all withdrawals as of March 2017," saving the company $90,000 per month.

Four witnesses, including IBC and RDAG employees who attended the meeting, testified at trial that the loan memorandum was based on representations Reagor made at the meeting, that the memorandum was used by the bank's approval committees to approve the loan and by its attorneys to draft the loan, and that if at any time anyone had known Reagor intended to use the loan for owner distributions, the loan would have been denied.[1]

---

[1] ROA.650, 666-68 (testimony of William Patrick Schonacher, president and CEO of IBC Bank Oklahoma); ROA.701-02 (testimony of Thomas Hutchison, attorney who does legal work for IBC); ROA.809-10, 831-32 (testimony of Shane Smith, then-Chief Financial Officer of RDAG) ("Q.  Did yourself, the defendant, and other representatives of Reagor-Dykes tell IBC Bank that the working capital loan would be used for working capital?  A. Yes.  Q.  Was there any other purpose stated for that loan other than working capital?  A.  No, sir.  Q.  During that meeting, did the defendant, or anyone else, ever tell IBC Bank that the working capital loan proceeds will be used for the defendant's personal use or benefit?  A.  No, sir.  Q.  Was that ever discussed at all?  A.  No, sir, not with them."); ROA.919 (testimony of Shane Smith) ("Q.  At the time [Reagor] gave you those instructions, did you know it was wrong to distribute the working capital loan proceeds that

The final agreement reflected a loan of $10 million for working capital and a $25 million refinancing loan secured by a mortgage. Following negotiations between Smith and IBC, a term in the loan agreement that prohibited distributions except for tax purposes was altered in June 2017 to prohibit only distributions made without prior consent "if a Default or Event of Default exists or would result therefrom."

Before any of the loan proceeds were disbursed, Reagor emailed his Chief Financial Officer, Shane Smith, instructing him that Reagor and Rick Dykes "have decided to pay ourselves the first 33.3% of every dollar we borrow," and instructing Smith to take care of those disbursements but cautioning, "**How we are going to manage this capital is 100000000% confidential between us and is not ANYONE ELSE'S BUSINESS!!!!!! NOBODY'S!!!!!!!!!!!!!  NO BANKERS OR ANYONE ELSE!  OUR BUSINESS! GAME ON!!!!!!!!!!!!**"[2] The first disbursement of $5 million occurred in July 2017, and on that same day, Smith wired $2 million into the account of an RDAG entity and wrote Reagor a check for $766,277.77 out of those funds. Before the second disbursement, Reagor said to his sales team on video:

---

way? A. I didn't know it was illegal. Q. Did you know it was wrong? A. Yes."); ROA.749, 760 (testimony of William Woodring, former vice president of commercial banking and commercial lending at IBC) ("Q. Did the defendant make representations to you at the April 2017 meeting? A. Yes. Q. And were those representations included in this commercial loan memorandum? A. Yes. Q. And where was it included in this commercial loan memorandum? A. They are summarized throughout the package, including the use of funds."); ROA.761-62 (testimony of William Woodring) ("Q. Before this criminal case, did you have any idea that the defendant intended to take a personal distribution from the working capital loan proceeds? A. No. Q. And if the defendant had told you at the initial meeting in April 2017 that he planned to take a personal distribution of the working capital loan proceeds, would you have approved this loan? A. No.").

[2] ROA.1862-63 (Exhibit 41) (all bolding and emphasis in original).

No. 22-10271

> OPM. Other people's money. That's how I did it. When you don't have money, you talk other people into giving you their money so you can use their money to increase your net worth. That's how I did it. [Reagor laughs] OPM. How else? But I'm a hell of a salesman! I'm just telling you. Y'all . . . most of y'all have no comprehension of the sh*t I've pulled off in this lifetime.[3]

Another disbursement of $5 million occurred in February 2018, and Smith again moved $2 million into an RDAG entity account and cut Reagor a check for $1 million out of those funds. The combined $1.7 million out of both disbursements was deposited into Reagor's personal checking account and used to pay off personal credit cards, to make payments to family, and for improvements to his "mansion on 19th Street."

After fraud schemes unrelated to bank fraud rendered RDAG insolvent, Reagor was indicted based on the allegations at issue in this case. There was testimony at trial that the distributions to Reagor, made in contravention of the loan's purpose section, were an event of default and violated the agreement.[4] The jury found Reagor not guilty on two counts of bank fraud and guilty on one count of making a false statement to the bank in violation of 18 U.S.C. § 1014.

---

[3] ROA.537, 859-60 (Exhibit 48); United States Br. at 8.

[4] ROA.710, 708 (testimony of Thomas Hutchison) ("Q. . . . If there was a distribution for a purpose other than what's in Section 2.01(b), would that be an event of default? A. Yes. It would be under this section because 2.01(b) states the borrower shall use the advancing term loan for working capital only, which is a covenant for an agreement of the borrower or the borrower group member, and so if those working capital—if the loan is used for any other purpose, it would constitute a default or event of default under this subsection (e)."); *see also* ROA.1881 (defining "Borrower Group" by pointing to Schedule 5.01, a list of entities that does not include Reagor); ROA.1922 (Schedule 5.01).

No. 22-10271

## II

Reagor's preserved challenge to the sufficiency of the evidence is reviewed de novo.[5]  Our court must affirm a criminal conviction "if, after viewing the evidence and all reasonable inferences in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[6]  "We do not delve into the evidentiary weeds: The jury 'retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of witnesses.'"[7]

The elements of the § 1014 false statement offense are "(1) the defendant knowingly and willfully made a false statement to the bank, (2) the defendant knew that the statement was false when he made it, (3) the defendant made the false statement for the purpose of influencing the bank to extend credit, and (4) the bank . . . was federally insured."[8]  "We have held that if a person makes a false statement that has the capacity to influence the bank, 'then the specific intent necessary to violate [Section] 1014 may be inferred and the offense is complete.'"[9]

The jury was free to believe the Government's expert over the defense experts that the definition of working capital was clear and did not include owner distributions.  "We will not second guess the jury in its choice of which

---

[5] *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012).

[6] *United States v. Vargas-Ocampo*, 747 F.3d 299, 301 (5th Cir. 2014) (en banc) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

[7] *United States v. Scott*, 892 F.3d 791, 796-97 (5th Cir. 2018) (quoting *Grant*, 683 F.3d at 642).

[8] *United States v. Sandlin*, 589 F.3d 749, 753 (5th Cir. 2009).

[9] *Id.* at 754 (alteration in original) (quoting *United States v. Johnson*, 585 F.2d 119, 124 (5th Cir. 1978)).

witnesses to believe."[10]  The jury was also free to credit the circumstantial evidence of Reagor's state of mind—the email he sent requiring the distribution plan to be kept confidential from the bankers, the statements he made to his staff at the meeting on video about using other people's money, and the testimony that the loan memorandum reflected what Reagor said at the meeting he had with bank representatives prior to obtaining the loan.  The Government may prove its case by direct or circumstantial evidence,[11] and, "[a]bsent a confession, intent will almost always have to be established by circumstantial evidence."[12]

Although conflicting evidence existed, the jury could weigh the testimony from prosecution and defense witnesses as to the meaning of terms in the loan agreement to conclude both that the agreement prohibited distributions made without permission and that Reagor knew that working capital excluded owner distributions when he represented to the bank that the loan would be used for working capital.  "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt."[13]  "As is its prerogative, the jury in this case found that [Reagor's] actions evinced a knowing and willful state of mind.  We will not disturb that finding."[14]

---

[10] *United States v. Zuniga*, 18 F.3d 1254, 1260 (5th Cir. 1994) (citing *United States v. Jones*, 839 F.2d 1041, 1047 (5th Cir. 1988)).

[11] *See United States v. Mitchell*, 484 F.3d 762, 768 (5th Cir. 2007).

[12] *Sandlin*, 589 F.3d at 755.

[13] *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012) (quoting *United States v. Moreno*, 185 F.3d 465, 471 (5th Cir. 1999)).

[14] *Sandlin*, 589 F.3d at 754.

No. 22-10271

\*     \*     \*

For the reasons stated, the judgment of the district court is AFFIRMED.