IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 13, 2009

Charles R. Fulbruge III
Clerk

No. 07-20885

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

MARJORIE ATKINSON FORD

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:07-cr-00033-2

Before BENAVIDES, SOUTHWICK, and HAYNES, Circuit Judges.

PER CURIAM:[*]

This is a direct criminal appeal from a conviction for conspiracy to commit wire fraud after a jury trial. Appellant Marjorie Ford argues the evidence is insufficient to sustain the conviction, claiming that the government failed to prove that she knowingly participated in the wire fraud scheme. Appellant also contends that the district court erred in imposing two sentencing enhancements and that her guideline sentence is unreasonable. Viewing the evidence in the

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

light most favorable to the jury verdict, we find the evidence sufficient to sustain the conviction. Additionally, finding no sentencing error, we affirm the sentence.

I.     FACTUAL AND PROCEDURAL HISTORY

The wire fraud scheme involved a series of real estate transactions in which co-defendant Michael Harris, aided by Ford and a mortgage broker, Jim Houston, orchestrated a scheme in which the sale price of houses were inflated using false invoices for construction, home audio, or landscaping services that Harris's company never actually provided. Thus, lenders would loan an amount greater than the value of the house, with the additional amount divided among the borrower and Harris. Additionally, during most of the transactions, Houston's wife Melissa would be paid a commission even though she did not perform any services. Harris and Houston recruited buyers, and if the buyer was unable to qualify for the loan, they would employ a "credit repair service," owned by Carlin Joubert, to add credit lines to boost the buyer's credit score and sometimes provide the purchaser with a false social security number.

Ford was responsible for preparing false real estate documents and closing transactions (even though her escrow license had been suspended and she could not legitimately close transactions), thereby facilitating the payment of inflated loans and fraudulent invoices. Ford worked for several title companies during the relevant time period, including AmeriTrust Title Company, her employer at the time of her arrest.

Harris also used the services of Valencia Armstead, a branch manager for Compass Bank. In order to induce lenders to make loans, Armstead issued false verifications of deposit for individuals who did not have the requisite funds for the loans.

Harris later recruited Armstead herself to purchase a house at 16472 Ryan Guinn Way, even though she had bad credit and had never visited the property. Harris used Joubert's company to "boost" Armstead's credit score and obtain a

fraudulent social security number. At the time of Armstead's closing date, January 8, 2007, the Secret Service was investigating the case and approached Armstead at her bank office. Armstead agreed to cooperate and assist in recording conversations. Armstead called Harris, and Harris said that he would not be at the closing but Ford would be there. Harris vouched that Ford was "cool" and that he had worked with Ford in the past. The transaction was designed to net $17,000 from the proceeds of the loan from Countrywide Home Loans, with Armstead to receive a share. For the closing of this loan, Ford received instructions from Countrywide's representative. When Armstead arrived at the closing (wearing a recording device), both Harris and Ford were present. Armstead had not previously seen her own loan application. Armstead told Ford that the social security number on her loan application was incorrect. Instead of stopping the closing and informing Countrywide—pursuant to Countrywide's prior instructions—Ford told Armstead to correct the number and continue signing documents. Further, even though the evidence indicated that Ford knew that Armstead would not be living in the Ryan Guinn property (the plan was to lease the residence), Ford had Armstead sign a certificate of occupancy. Armstead testified as to "side conversations" between Harris and Ford and other circumstances that made it appear to Armstead that Ford was a knowledgeable participant. Harris and Ford were arrested during this transaction.

A grand jury returned a one-count indictment charging Harris and Ford with conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1343 and 1349. Harris pleaded guilty to the indictment. Ford was tried by a jury and found guilty as charged. At sentencing, the district court imposed a 16-level enhancement based on the finding of intended loss in excess of $1,000,000. U.S.S.G. § 2B1.1(b)(1)(I). The district court also imposed a two-level increase based on a finding of ten or more victims. U.S.S.G. § 2B1.1(b)(2)(A)(i). These

enhancements resulted in an offense level of 24. With a criminal history category of II, Ford's guideline range was 57-71. Although the government recommended a sentence in the middle of the range, the district court sentenced Ford to the longest sentence within the range (71 months). Ford now appeals.

II.    ANALYSIS

A.    Sufficiency of the Evidence

Ford contends that the evidence is insufficient to sustain her conviction for conspiracy to commit wire fraud. When reviewing the sufficiency of the evidence, we view all evidence, whether circumstantial or direct, in the light most favorable to the government, with all reasonable inferences and credibility choices to be made in support of the jury's verdict. United States v. Salazar, 958 F.2d 1285, 1290–91 (5th Cir. 1992). The evidence is sufficient to support a conviction if a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Id. The evidence need not exclude every reasonable hypothesis of innocence or be completely inconsistent with every conclusion except guilt, so long as a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. United States v. Faulkner, 17 F.3d 745, 768 (5th Cir. 1994). With respect to the offense of wire fraud, the "government must prove beyond a reasonable doubt that the defendant: (1) engaged in a scheme to defraud and (2) used, or caused the use of, wire communications in furtherance of that scheme." United States v. Rivera, 295 F.3d 461, 466 (5th Cir. 2002) (citing 18 U.S.C. § 1343). With respect to conspiracy, the district court's instructions provided that the jury must be convinced beyond a reasonable doubt that: (1) "two or more persons, directly or indirectly, reached an agreement to devise and execute a scheme to defraud"; (2) "the defendant knew the unlawful purpose of the agreement;" and (3) "the defendant joined in the agreement willfully, that is, with the intent to further the unlawful purpose."

Ford does not dispute that there was a conspiracy to commit wire fraud; instead, she contends that she did not knowingly participate in it. The defense's position at trial was that Ford innocently followed the instructions from Harris and Houston. Ford contends that her role was to process documents that were approved and signed by other individuals and send them to the lender. Upon receipt of the documents, the lender wired funds to the title company pursuant to the settlement statement.

Accordingly, the issue is whether the evidence is sufficient to show that Ford was aware of the misrepresentations and misinformation she submitted to the lenders. At trial, Harris, Ford's codefendant, testified that he:

> conspired with Ms. Ford. Her role was not as far as getting the process going with the mortgage company. Her role was with the title, disbursing the funds. That's what I conspired with her, as far as . . . the title stuff. As far as the money, the transfer, the wire coming back, how the money was being disbursed.

Harris also testified that Ford did "whatever she had to do as far as being a closer to manipulate the [settlement statement] to make it go smoothly." As Ford admits, Harris's testimony also indicated that Ford knew to pay Harris and Houston from the lenders' funds for services that had not been performed on the houses. He also testified that on one occasion he failed to bring a cashier's check for the earnest money to a closing, and Ford "just like made one on the computer and faxed it to the lender." Harris testified that Ford was aware that some of the buyers were fraudulently claiming in a certificate of occupancy that the home would be a primary residence.

Armstead testified that she did not meet Ford until the closing that precipitated Ford's arrest. Armstead further testified that she believed that Ford "knew more about what was going on." Armstead came to this conclusion based on the conversation during the closing, "the looks exchanged between the two [Harris and Ford]" and "the fact that [Harris] had said that [Ford] worked

with him and she was cool." During Armstead's closing, although Armstead told Ford that her social security number was incorrect, Ford did not stop the closing in accordance with the lender's rules. Instead, Ford instructed Armstead to correct the number and continue to sign the forms.

Additionally, Special Agent Vincent Edwards testified that he monitored the audio of the closing that culminated in Ford's arrest. He testified that when he interrupted the closing, he inquired of each person what their purpose was at the closing. Ford responded that she was representing the builder. To the contrary, Ford was employed by AmeriTrust Title. We have previously recognized that lying to agents is evidence of guilty knowledge. United States v. Romero-Reyna, 867 F.2d 834, 836 (5th Cir. 1989).

Ford contends that the testimony of Harris was insufficient to prove that she knowingly participated. This Court has explained that it "is concerned only with the sufficiency—not the weight—of evidence." United States v. Garcia, 995 F.2d 556, 561 (5th Cir. 1993). To put a finer point on it, the credibility of a witness and the "weight of the evidence is the exclusive province of the jury." Id. The jury was free to credit Harris's testimony. Indeed, this Court is bound to accept a jury's credibility determinations unless the challenged testimony "is so unbelievable on its face that it defies physical laws." United States v. McKenzie, 768 F.2d 602, 605 (5th Cir. 1985).

Ford also points to evidence showing that she was unaware of the fake social security numbers. The government does not contend that she had knowledge of the fake social security numbers. Indeed, Harris's testimony makes clear that Ford's role in the conspiracy did not involve knowledge of the fake social security numbers. Ford's role was to ensure that the settlement statement was manipulated such that the lender would be unaware that the amount of the loan was fraudulently inflated. Ford would also facilitate concealing certain information from the lender —such as the fact that the buyer

was not going to occupy the home as a primary residence. Accordingly, we find that the evidence, viewed in the light most favorable to the verdict, allows a rational trier of fact to find that Ford knowingly participated in the wire fraud scheme. The conviction is AFFIRMED.

### B. Sentencing

#### 1. Amount of Loss

Ford contends that the district court erred in calculating the amount of loss under § 2B1.1(b)(1). The district court adopted the loss calculation contained in the PSR. A PSR "is considered reliable and may be considered as evidence by the court when making sentencing determinations." United States v. Vela, 927 F.2d 197, 201 (5th Cir. 1991). "In making its factual findings for sentencing, a district court may adopt the findings of the PSR without additional inquiry if those facts have an evidentiary basis with sufficient indicia of reliability and the defendant does not present rebuttal evidence or otherwise demonstrate that the information is materially unreliable." United States v. Valles, 484 F.3d 745, 759 (5th Cir. 2007). "The defendant has the burden of showing that the information relied on by the district court in the PSR is materially unreliable." Id. at 759-60.

More specifically, Ford challenges the methodology relied upon by the district court. In response, the government asserts that the calculations Ford submitted to the district court in rebuttal use the same methodology of the PSR. In her reply brief, Ford asserts that using the PSR's amount of loss did not waive her argument. By using the same figures the government used, she failed to carry her burden of proving the figures and methodology were materially unreliable or erroneous before the district court. With respect to Ford's remaining challenges to the calculation of loss, Ford has failed to show clear error.

## 2. Number of Victims

In her initial brief, Ford contends that the district court erred in applying the two-level enhancement to her offense level based on finding ten or more victims. § 2B1.1(b)(2)(A)(i). She asserts that the "government never provided the district court with the list of lenders who suffered losses." Ford further argues that "[a]t a bare minimum, the government was obligated to provide the list of victims to support an enhancement based on their number. This it did not do." In response, the government's brief provides that the attachment to the PSR specifically listed the names of the victims as follows:

> The Federal Home Loan Mortgage Corporation, Ocwen Loans Servicing, LLC, Washington Mutual Home Loans, Securitized Asset Trust-NCZ, Nations (the builder in many transactions), Residential Funding Company, LLC, NHB to Akon Eluma, Bear Stearn Institutional Lenders, Federal National Mortgage Association, Argent Mortgage Section, Inc., Deutsche Bank National Trust, and GMAC Mortgage, LLC.

In her reply brief, Ford does not dispute that the attachment to the PSR listed ten victims. Instead, she points to the district court's statement of its reason for not ordering restitution to the victims. Contrary to Ford's assertion, the record of the sentencing hearing makes clear that the district court overruled her objection to the number of victims under § 2B1.1(b)(2)(A)(i). Ford has failed to show the district court clearly erred in finding ten victims.

## 3. Reasonableness

Finally, Ford contends that the district court imposed an unreasonable sentence. Her sole basis for this contention is that her sentence was imposed prior to the Supreme Court's opinions in Kimbrough v. United States, 128 S. Ct. 558 (2007), and Gall v. United States, 128 S. Ct. 586 (2007). Kimbrough held that a district court had discretion to vary from the guidelines based on a disagreement with guideline policy. See United States v. Gomez-Herrera, 523 F.3d 554, 563 (5th Cir. 2008). With respect to Gall, Ford relies on the Supreme

Court's rejection of a rule that requires extraordinary circumstances to justify a sentence outside the guidelines range. 128 S. Ct. at 595. In the instant case, there is no indication that the district court disagreed with the guideline range or somehow felt constrained by our pre-Gall/Kimbrough precedent.[1] We have previously rejected this claim under similar circumstances. See United States v. Rodriguez-Rodriguez, 530 F.3d 381, 387-89 (5th Cir. 2008) (finding no plain error as to claim of unreasonable sentence after Kimbrough even though district court sentenced defendant to the lowest end of the guideline range). Here, the district court stated that it had considered the guidelines and the factors under 18 U.S.C. § 3553(a). Ford has not overcome the presumption of reasonableness afforded her guidelines sentence. See Rita v. United States, 127 S. Ct. 2456, 2462–68 (2007); United States v. Alonzo, 435 F.3d 551, 554 (5th Cir. 2006).

For the above reasons, the district court's judgment is AFFIRMED.

---

[1] Indeed, the district court sentenced Ford to the highest end of the guideline range despite the government's recommendation of a mid-range sentence.