## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 2, 2012

No. 09-50989

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

JUAN FRANCISCO CHAVEZ-IBARRA,

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas
USDC No. 4:09-cr-155-1

Before KING, SMITH, and HIGGINSON, Circuit Judges.

PER CURIAM:[*]

Defendant–Appellant Juan Francisco Chavez–Ibarra was convicted of ten drug-related crimes. On appeal, Chavez–Ibarra contends that there was insufficient evidence to support his conviction for six of the crimes. Chavez–Ibarra also contends that the sentences imposed for two of his convictions were unreasonable. For the reasons stated below, we AFFIRM.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 09-50989

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant–Appellant Juan Francisco Chavez–Ibarra ("Chavez–Ibarra") was charged in a multi-count federal indictment with various drug-related crimes. As relevant here, the indictment specifically charged Chavez–Ibarra with: (1) conspiracy to possess with intent to distribute between 100 and 1,000 kilograms of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count One); (2) conspiracy to import into the United States between 100 and 1,000 kilograms of marijuana in violation of 21 U.S.C. §§ 846, 952, and 960 (Count Two); (3) aiding and abetting the possession of less than 50 kilograms of marijuana with intent to distribute, on or about March 1 and April 2, 2006, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Counts Three and Five); and (4) aiding and abetting the importation into the United States of less than 50 kilograms of marijuana, on or about March 1 and April 2, 2006, in violation of 21 U.S.C. §§ 952 and 960 and 18 U.S.C. § 2 (Counts Four and Six).[1]

The evidence at trial showed that Chavez–Ibarra had recruited three individuals—Paul Gassett ("Gassett"), Teddy Nevins, and Teddy's wife Jacki Nevins (the "Nevinses")—to transport marijuana from Mexico to the United States. Between them, Gassett and the Nevinses made at least four trips to and from Mexico under Chavez–Ibarra's direction. The first two of these trips, occurring on or about March 1 and April 2, 2006, resulted in successful border crossings by Gassett. During the third trip, which took place on or about April 16, 2006, Gassett was arrested after U.S. Customs and Border Protection inspectors seized thirty kilograms of marijuana from a hidden compartment in

---

[1] The indictment also charged Chavez–Ibarra with: (1) aiding and abetting the possession of less than 50 kilograms of marijuana with intent to distribute, on or about April 16 and May 18, 2006, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Counts Seven and Nine); and (2) aiding and abetting the importation into the United States of less than 50 kilograms of marijuana, on or about April 16 and May 18, 2006, in violation of 21 U.S.C. §§ 952 and 960 and 18 U.S.C. § 2 (Counts Eight and Ten). Chavez–Ibarra does not appeal his convictions for Counts Seven through Ten.

No. 09-50989

the vehicle he was driving.  Weeks later, on or about May 18, 2006, the Nevinses were similarly arrested after inspectors discovered thirty-five kilograms of marijuana hidden in their vehicle.

A jury found Chavez–Ibarra guilty of all ten counts charged in the indictment and the district court sentenced him to 121 months of imprisonment—the high end of the applicable guidelines range—on each of Counts One and Two, and 60 months of imprisonment on each of Counts Three through Ten.  The court ordered all sentences to be served concurrently. Chavez–Ibarra timely appeals, contending that the evidence was insufficient to support his conviction for the crimes charged in Counts One through Six, and that the sentences imposed by the district court for Counts One and Two were unreasonable.[2]

## II. DISCUSSION

**A. The Sufficiency of the Evidence Supporting the Convictions for Counts One through Six**

*1. Standard of Review*

Chavez–Ibarra properly preserved his challenge to the sufficiency of the evidence by moving for a judgment of acquittal under Federal Rule of Criminal Procedure 29. "This court reviews preserved challenges to the sufficiency of the evidence de novo." *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012). "When reviewing the sufficiency of the evidence, we view all evidence, whether circumstantial or direct, in the light most favorable to the government, with all reasonable inferences and credibility choices to be made in support of the jury's verdict." *United States v. Ford*, 558 F.3d 371, 375 (5th Cir. 2009).  On review, the question is whether "a rational trier of fact could have found the essential

---

[2] As noted, Chavez–Ibarra does not appeal his convictions for Counts Seven through Ten, relating to the marijuana transported by Gassett and the Nevinses on April 16 and May 18, 2006, respectively.

elements of the crime beyond a reasonable doubt." *United States v. Seale*, 600 F.3d 473, 496 (5th Cir. 2010). "A jury is free to choose among reasonable constructions of the evidence." *United States v. Pigrum*, 922 F.2d 249, 254 (5th Cir. 1991). Accordingly, our review is "highly deferential to the verdict." *United States v. Harris*, 293 F.3d 863, 869 (5th Cir. 2002).

*2. The Evidence Was Sufficient to Support Chavez–Ibarra's Convictions*

As noted, the indictment charged Chavez–Ibarra in Counts Three and Five with aiding and abetting the possession of less than fifty kilograms of marijuana with intent to distribute. "To convict a defendant for possession of marijuana with intent to distribute, the Government must prove that the defendant (1) knowingly; (2) possessed marijuana; (3) with the intent to distribute." *United States v. Garcia*, 242 F.3d 593, 596 (5th Cir. 2001). In Counts Four and Six, Chavez–Ibarra was charged with aiding and abetting the importation of less than fifty kilograms of marijuana into the United States. To convict a defendant of this charge, the Government must establish: "(1) the defendant played a role in bringing a quantity of a controlled substance into the United States from outside of the country; (2) the defendant knew the substance was controlled; and (3) the defendant knew the substance would enter the United States." *United States v. Moreno*, 185 F.3d 465, 471 (5th Cir. 1999).[3] Significantly, then, the quantity of marijuana involved in the crimes charged in Counts Three through Six is not an element of the underlying offenses. *See* 21 U.S.C. § 841(b)(1)(D)*; United States v. Patino–Prado*, 533 F.3d 304, 312 (5th Cir. 2008) ("Even without a jury finding of a specific quantity of a drug, a defendant may receive up to a five-year sentence for conspiring to possess with intent to distribute an unknown quantity of marihuana.").

---

[3] Importantly for Counts Three through Six, "[a] person who aids and abets another to commit a crime is punishable as a principal." *United States v. Infante*, 404 F.3d 376, 385 (5th Cir. 2005).

No. 09-50989

In contrast, to prove a drug conspiracy as charged in Counts One and Two, "the government must establish '(1) the existence of an agreement between two or more persons to violate federal narcotics laws; (2) the defendant's knowledge of the agreement; . . . (3) the defendant's voluntary participation in the agreement'"; and, where "the indictment alleges a quantity greater than 100 kilograms of marijuana, triggering [enhanced] punishment within the statutory range of 21 U.S.C. § 841(b)(1)(B)(vii)," (4) "proof of an amount greater than 100 kilograms" of marijuana. *United States v. DeLeon*, 247 F.3d 593, 596 (5th Cir. 2001) (quoting *United States v. Gonzales*, 79 F.3d 413, 423 (5th Cir. 1996)).[4]

Chavez–Ibarra's challenge to the sufficiency of the evidence to support his convictions under Counts One through Six rests on his contention that the Government did not prove that Gassett was transporting *any* marijuana—let alone the amount required to support the conspiracy charges—during his first two trips to Mexico. Chavez–Ibarra stresses, in other words, that there was no direct evidence presented at trial that Gassett transported any marijuana on or about March 1 and April 2, 2006, as reflected in Counts Three through Six. Moreover, while Chavez–Ibarra does not appeal his convictions under Counts Seven through Ten, he submits that they establish only that he was involved in crimes connected to sixty-five kilograms of marijuana, an amount thirty-five kilograms less than the quantity charged under Counts One and Two.

---

[4] Notably, as is true in this case, "an indictment's allegation of a drug-quantity *range*, as opposed to a precise drug quantity, is sufficient." *DeLeon*, 247 F.3d at 597 (emphasis added). We also observe in passing that this circuit's pattern jury instructions include commentary regarding how the issues raised in this appeal may be avoided. In particular, a note to section 2.87 states that "if there is a fact dispute as to whether the amount [of a drug] is above or below a particular baseline (e.g., 100 kilograms of marijuana versus 99 kilograms), the court may consider submitting the higher amount in the fourth element accompanied by a Lesser Included Offense instruction . . . for the lower amount," or, alternatively, substituting for the quantity "element a special interrogatory on the verdict form asking the jury to determine the exact amount of the controlled substance." FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (CRIMINAL CASES) § 2.87 (2001) (Note).

No. 09-50989

To support his argument, Chavez–Ibarra seizes on the fact that Gassett did not testify that he personally saw any marijuana during his first two trips from Mexico. Indeed, Chavez–Ibarra implies that there was no marijuana in the vehicle during those trips, but that Gassett simply may have been "burning the plates" of the vehicle—a technique by which drug smugglers repeatedly cross the border in a vehicle that is not loaded with drugs to reduce suspicion.[5] Chavez–Ibarra also emphasizes that he agreed to pay Gassett more for the third trip than he had for the first two, suggesting that Gassett was not transporting marijuana on the first two occasions. In view of these arguments, Chavez–Ibarra asserts that his convictions for the crimes charged in Counts One through Six were based on improper speculation and therefore must be overturned. *See United States v. Crain*, 33 F.3d 480, 487 (5th Cir. 1994) ("[W]e suspect that the jury must have *speculated* [the defendant] into a conviction, piling inference upon inference, which it cannot do. Inferences must stop at some point." (citation and internal quotation marks omitted)).

Despite Chavez–Ibarra's arguments to the contrary, however, the evidence was sufficient to convict him of the charges set forth in Counts One through Six. Chavez–Ibarra's arguments essentially highlight the lack of direct evidence regarding the quantity of marijuana—if any—Gassett transported during his first two trips from Mexico, but these arguments neglect that the Government may prove its case with either direct or circumstantial evidence.

On this point, *United States v. Arras*, 373 F.3d 1071 (10th Cir. 2004), is illustrative. There, despite the defendants' challenge to the sufficiency of the evidence, the court affirmed their convictions for conspiracy to import and possess more than 100 kilograms of marijuana. *Id.* at 1073. As here, the

---

[5] By collecting the license plate number of every vehicle that crosses the border, the Treasury Enforcement Communications System (TECS) allows Immigration and Customs Enforcement officials to monitor suspicious activity.

defendants in *Arras* challenged the convictions specifically on the assertion that the Government had not established that "the amount of marijuana involved in the conspiracies was over 100 kilograms." *Id.* Indeed, the only direct evidence of the quantity of marijuana involved in the conspiracies was thirty-nine kilograms of marijuana seized when Tammy Nielsen ("Nielsen") was arrested while attempting to enter the United States with marijuana in metal canisters inside her vehicle's tires. *Id.* Nielsen also testified, however, that the defendants had hired her to transport drugs on four separate occasions and that she knew she was transporting drugs during each of the four trips. *Id.* at 1073, 1074. Although Nielsen had not seen any marijuana stored in her tires on the trips she completed before her arrest, she was instructed prior to each of those trips to check the oil and tire pressure regularly, and was paid $2,000 for a trip within the United States and $4,000 for trips that required border crossings. *Id.* at 1074–75. A customs agent testified that the standard rate for transporting marijuana was $50 per pound, which supported the inference that Nielsen had transported over 100 kilograms of marijuana during the course of the four trips she made for the defendants. *Id.* at 1075. The court stated that although it was "a close case, our review of the record convinces us that the evidence was sufficient to support defendants' convictions and that the jury's conclusion was not based on improper speculation or conjecture." *Id.* at 1074.

This court's decision in *United States v. Turner*, 319 F.3d 716 (5th Cir. 2003), is similarly instructive. In *Turner*, defendant John Turner ("Turner") challenged his conviction for conspiracy to distribute more than five kilograms of cocaine. *Id.* at 718. Victor Jiminez ("Jiminez"), one of Turner's alleged co-conspirators, testified that he sold approximately four kilograms of cocaine to Julius Robinson ("Robinson"), another alleged co-conspirator. *Id.* at 719. Further, the Government introduced evidence of a phone call wherein Robinson attempted to buy half a kilogram of cocaine from Jiminez, but Jiminez refused

because he normally did not deal in amounts under one kilogram. *Id.* Even with evidence of these two transactions, though, "[t]he Government only provided direct evidence of the involvement of 4.5 kilograms of cocaine" in the conspiracy. *Id.* at 723–24. Accordingly, Turner contended that there was insufficient evidence regarding the involvement of the requisite quantity of five kilograms of cocaine. *Id.* at 721. This court explained, however, that there was sufficient *circumstantial* evidence suggesting that the conspiracy involved more than five kilograms of cocaine. *Id.* at 723–24. In particular, Jiminez testified that Robinson had unsuccessfully sought to buy cocaine from him on three or four occasions. *Id.* at 719. "Because Jiminez dealt in one-kilogram quantities only," the court agreed with the Government's argument "that Jiminez and Robinson's conversations about transactions that did not materialize create[d] the inference that the conspiracy involved at least five kilograms" of cocaine. *Id.* at 724 ("[A]ny additional request by Robinson of Jiminez would have pushed the total drug quantity involved in the conspiracy over five kilograms. Viewing the evidence in the light most favorable to the Government, . . . the inference that more than five kilograms were involved is reasonable."). Accordingly, the court upheld Turner's conviction, even though the government had direct evidence of only a portion of the quantity of drugs charged.

As in *Arras* and *Turner*, although the Government in this case lacked direct evidence establishing that Gassett transported any particular quantity of marijuana on March 1 and April 2, 2006, there was similarly sufficient circumstantial evidence to support the jury's verdict. For example, the Government repeatedly highlighted the considerable effort and expense those trips involved, thereby raising the inference that Gassett undertook those trips for the purpose of transporting a distributable amount of marijuana. Gassett testified, for instance, that prior to his first trip, he met with Chavez–Ibarra to obtain instructions regarding how the operation was to proceed. During that

meeting, Chavez–Ibarra told Gassett that he had rented a car for Gassett to drive from Wichita, Kansas to Odessa, Texas. Once Gassett arrived in Odessa, he was to obtain, in his name, registration papers and license plates for an Isuzu Rodeo (the "Rodeo") that he understood was loaded with marijuana and waiting for him in Mexico. From Odessa, Gassett was to take a bus to Presidio, Texas, where Chavez–Ibarra had arranged for some of his associates to pick Gassett up and take him into Mexico to retrieve the Rodeo. Evidence introduced by the Government established that, aside from the compensation due Gassett for this trip, Chavez–Ibarra also incurred the expenses related to it, including a fee of nearly $700 for the rental vehicle Gassett drove to Odessa.

Moreover, although Gassett did not state whether he had seen any drugs in the vehicle during his first two trips, he testified that he proceeded as Chavez–Ibarra instructed and that he operated with the understanding that the Rodeo was loaded with marijuana. He further testified that, after obtaining the Rodeo in Mexico, he drove to Wichita, Kansas and "dropped the first load off" at an address previously provided to him.

Gassett also explained that, after the first trip, he returned home with the Rodeo where he awaited further instructions. According to his testimony, he was directed just weeks later to return to Mexico to "pick up another load." Upon arriving in Mexico, with the same Rodeo he used during his first trip, individuals connected to Chavez–Ibarra escorted Gassett to a motel room and took possession of the vehicle. The Rodeo was not returned to Gassett until the following morning, raising the inference that it was being loaded with drugs during that period.

To corroborate Gassett's testimony, the Government introduced numerous documents establishing that these activities took place as Gassett described. Rental car records, for instance, showed that Chavez–Ibarra rented in Wichita, Kansas the vehicle Gassett drove to Texas during his first trip. Border crossing

records showed the Rodeo crossing into the United States from Mexico on March 1 and April 2, 2006. A speeding citation was issued by a Texas state trooper on April 2, 2006 to Gassett's wife who had accompanied him during his second trip and was driving the Rodeo back into the United States. And, during Gassett's second and third trips, wire transfer receipts established that Chavez–Ibarra wired money to Gassett in Odessa, Texas, for expenses related to the drug trafficking activities.

While Chavez–Ibarra emphasizes that he agreed to pay Gassett more for the third trip than the first two—suggesting that Gassett was not transporting any marijuana on the first two occasions—Gassett testified that the agreement for increased compensation only arose after he complained to Chavez–Ibarra that he was not being compensated commensurately with the "risk" he was taking. Only in response to that complaint did Chavez–Ibarra agree that, if Gassett made another trip, he would increase Gassett's pay and give him the Rodeo.

Though circumstantial, the totality of this evidence supports the jury's conclusion that Gassett was transporting distributable amounts of marijuana during the trips that took place on March 1 and April 2, 2006.

As for establishing that the conspiracy involved at least 100 kilograms of marijuana, as required for Counts One and Two, the Government demonstrated at trial that at least four trips were undertaken at Chavez–Ibarra's direction. Two of the trips resulted in the seizure of sixty-five kilograms of marijuana: thirty kilograms from the Rodeo Gassett was driving on April 16, 2006, and thirty-five kilograms from the vehicle of the Nevinses on May 18, 2006. Significantly, the Nevinses were apprehended with thirty-five kilograms of marijuana during their *first* trip, raising the inference that significant quantities of marijuana likewise were transported by Gassett during his first trip. Furthermore, Gassett testified that he used the same vehicle during each of the

No. 09-50989

three trips he completed for Chavez–Ibarra, suggesting that he transported similar quantities of marijuana on each occasion. As noted, this testimony was corroborated by border crossing records, which showed the Rodeo seized on April 16, 2006 also entering the United States from Mexico on March 1 and April 2, 2006. Moreover, Gassett also stated that when he arrived in Mexico, the Rodeo was taken from him and not returned until the following day. From this evidence, the jury could reasonably have inferred that the Rodeo was loaded with similar quantities of marijuana during each of Gassett's trips.

Most importantly, the Government itself highlighted for the jury the lack of direct evidence establishing the amount of marijuana Gassett transported during his first two trips. After reminding the jury in his closing statement that Gassett was not apprehended during those first two trips from Mexico, counsel for the Government stated to the jury:

> [T]he Government would submit to you that those two prior loads were the same amount as the load that got busted, which was 30 kilograms. If my math is correct, 30 on March 1, 30 on April 2nd, 30 on April 16th, and 35 on May 1[8]th equals 125 kilograms.

Consistent with the indictment, the jury was properly instructed that to convict Chavez–Ibarra of Counts One and Two, it had to find that the Government had proven beyond a reasonable doubt "[t]hat the overall scope of the conspiracy involved at least 100 kilograms" of marijuana. In other words, the jury was fully aware that it needed to weigh the evidence regarding quantity to determine if the Government had established beyond a reasonable doubt that the conspiracy involved at least 100 kilograms of marijuana. Although the evidence on this front was circumstantial, when viewed in the light most favorable to the Government, we cannot say that the jury's construction of the evidence was unreasonable. Indeed, the jury's conclusion that the conspiracy involved at least 100 kilograms of marijuana flowed from reasonable inferences and logical reasoning.

11

No. 09-50989

Accordingly, as in *Arras* and *Turner*, the direct and circumstantial evidence presented in this case provided a sufficient basis for the jury to convict Chavez–Ibarra of Counts One through Six.

## B. The Reasonableness of the Sentences

As mentioned above, Chavez–Ibarra claims that the sentences imposed by the district court for Counts One and Two were unreasonable. When considering the sentence to impose on a defendant, 18 U.S.C. § 3553(a) requires a court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." Section 3553(a)(2) states that the court must consider the need of the sentence imposed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

This court typically reviews the substantive reasonableness of a defendant's sentence under an abuse of discretion standard. *See Gall v. United States*, 552 U.S. 38, 51 (2007). However, in the proceedings before the district court, Chavez–Ibarra did not object to his sentences on reasonableness grounds, so his claim on appeal that they were unreasonable is reviewed only for plain error. *See United States v. Peltier*, 505 F.3d 389, 391–92 (5th Cir. 2007).[6] Further, because Chavez–Ibarra's sentences fall within the range recommended by the sentencing guidelines, they are presumed to be reasonable. *See United States v. Camero–Renobato*, 670 F.3d 633, 636 (5th Cir. 2012).

Chavez–Ibarra was sentenced to 121 months of imprisonment for each of Counts One and Two. He contends that a much shorter sentence would have

---

[6] Chavez–Ibarra argues that no objection is required, but he concedes that this argument is foreclosed in this circuit.

achieved the goals of sentencing and that his 121-month sentences were therefore unreasonable. He highlights that he had no criminal history, no prior arrests, and that his crime was nonviolent. Chavez–Ibarra also asserts that he "did not pose a danger to the public" and that the 60-month sentences imposed for Counts Three through Ten "would have been sufficient to teach him not to violate the law again."

Chavez–Ibarra's arguments merely set out that he "disagree[s] with the propriety of the sentence imposed," which this court has held "does not suffice to rebut the presumption of reasonableness that attaches to a within-guidelines sentence." *United States v. Ruiz*, 621 F.3d 390, 398 (5th Cir. 2010). Thus, because the sentences imposed did not depart from the guidelines, were not based on the consideration of inappropriate factors, and are entitled to "great deference," we decline Chavez–Ibarra's request to vacate them. *United States v. Alonzo*, 435 F.3d 551, 554 (5th Cir. 2006). There is no error here, plain or otherwise.

### III. CONCLUSION

For the reasons stated above, we AFFIRM the judgment of the district court.