# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
April 3, 2013

Lyle W. Cayce
Clerk

No. 12-40336

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

WILLIAM DOUG MITCHELL,

Defendant-Appellant

Appeal from the United States District Court
for the Eastern District of Texas
No. 4:10-CR-57-MAC-ALM-26

Before KING, HIGGINBOTHAM, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

In 2010, a grand jury indicted William Douglas Mitchell on two counts of mail fraud and one count of conspiracy to commit mail and wire fraud. Following a jury trial, Mitchell was convicted and sentenced on all three counts. Mitchell appeals, arguing that there was insufficient evidence to sustain his convictions, and that the district court reversibly erred in sentencing him. For the following reasons, we AFFIRM.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-40336

## I. FACTUAL AND PROCEDURAL BACKGROUND

On March 10, 2010, a grand jury returned an indictment charging William Mitchell and thirty-nine others with various offenses arising from their participation in a mortgage fraud scheme. The indictment charged Mitchell, in particular, with two counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 2, and one count of conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349. Following a jury trial, Mitchell was convicted on all three counts.

The evidence adduced at trial showed that, between February 2004 and July 2007, forty individuals—among them real estate agents, mortgage brokers, escrow officers, title company attorneys, property appraisers, and straw buyers—conspired to defraud numerous lending institutions of over $20 million by convincing them to approve mortgage loans for residential properties for which the appraised values had been fraudulently inflated. The scheme was orchestrated by John Barry, who controlled or directed the actions of each of the conspirators through a series of shell companies he owned. At Barry's direction, Mitchell, a certified and licensed real estate appraiser, allegedly inflated the appraised value of at least thirty-five properties, directly causing over $8 million in losses to lending institutions.

The fraud was perpetrated in one of two ways. The first method involved a single transaction in which straw purchasers recruited by Barry agreed to buy homes for significantly greater sums than the homes were worth, and for significantly higher prices than legitimate homeowners were seeking. Appraisers falsely inflated the appraised value of the targeted properties to convince lending institutions to finance the sales. With the assistance of real estate agents, mortgage brokers, and title company employees, straw purchasers obtained inflated mortgage loans based on false representations in loan applications regarding their income, assets, and intent to occupy the properties. The difference between a legitimate seller's asking price and the inflated loan

2

No. 12-40336

amount—which largely was based on the false appraisal—provided the fraudulently-obtained proceeds to the conspirators.

In the second method, conspirators again purchased homes from legitimate sellers, but then "flipped" them by selling the properties in a second, often simultaneous, transaction to straw buyers who paid substantially inflated prices. As in the first scheme, lending institutions funded the purchases based on the fraudulent appraisals of the homes' values and the false representations provided by the straw buyers in loan applications. Because the original transactions often closed simultaneously with the second, "flipped" transactions, the latter purchases usually financed the former purchases. The difference between the original sale price and the second sale price provided the conspirators' fraudulent proceeds.

At trial, the government presented extensive evidence to advance its theory that Mitchell played a critical role in the conspiracy by artificially inflating the property valuations in his appraisals. The government also argued that Mitchell was instrumental in concealing the fraud, insofar as he used the mails or forms of wire communication to submit false or materially misleading documents to lending institutions. In return for his appraisals, Mitchell received approximately $52,000, either directly from Barry or from one of Barry's companies. Mitchell did not disclose these proceeds to the lending institutions, though he routinely certified to them that he had "no present or prospective personal interest or bias with respect to the participants in the transaction," and that his "compensation for performing . . . [the] appraisals was not conditioned on any agreement or understanding, written or otherwise, that [he] would report or present analysis supporting a predetermined specific value."

At the conclusion of trial, a jury found Mitchell guilty of two counts of mail fraud and one count of conspiracy to commit mail and wire fraud. On March 27, 2012, the district court sentenced him to 120 months' imprisonment for each

3

count, with the sentences to run concurrently. Mitchell also was ordered to pay restitution in the amount of $8,245,423.

On April 18, 2012, the district court held another hearing at which it ensured that the withdrawal of Mitchell's trial attorney after the sentencing hearing had not adversely impacted Mitchell's rights, and that recently decided Supreme Court cases were not implicated in Mitchell's case. By that time, Barry had been sentenced to a term of 180 months. In light of Barry's sentence, the district court expressed that, "in hindsight," it had reservations about Mitchell's sentence. Although the court expressed its view that Mitchell's sentence was "reasonable" and still "legal," it also stated "for the record that were [it] to sentence [Mitchell] today, [it] would sentence him to about 84 months." Ultimately, however, the court concluded that did not have the authority "to sua sponte reduce Mr. Mitchell's sentence."

Mitchell appeals, alleging two errors. First, he argues that there was insufficient evidence for the jury to find him guilty. Second, Mitchell asserts that the district court erred in sentencing him. We will address each of these contentions in turn.

## II.  ANALYSIS

### A.    Evidentiary Sufficiency

#### 1.    Standard of Review

Mitchell properly preserved his challenge to the sufficiency of the evidence by moving for a judgment of acquittal under Federal Rule of Criminal Procedure 29 and renewing that motion at the close of evidence. *See United States v. Frye*, 489 F.3d 201, 207 (5th Cir. 2007). "This court reviews preserved challenges to the sufficiency of the evidence de novo." *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012). "When reviewing the sufficiency of the evidence, we view all evidence, whether circumstantial or direct, in the light most favorable to the government, with all reasonable inferences and credibility choices to be made in

support of the jury's verdict." *United States v. Ford*, 558 F.3d 371, 375 (5th Cir. 2009). On review, the question is whether "a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Seale*, 600 F.3d 473, 496 (5th Cir. 2010). "The evidence need not exclude every reasonable hypothesis of innocence or be completely inconsistent with every conclusion except guilt, so long as a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *United States v. Moser*, 123 F.3d 813, 819 (5th Cir. 1997). A jury, in other words, "is free to choose among reasonable constructions of the evidence." *United States v. Pigrum*, 922 F.2d 249, 254 (5th Cir. 1991). Accordingly, our review "is highly deferential to the verdict." *United States v. Harris*, 293 F.3d 863, 869 (5th Cir. 2002).

### 2.    Conspiracy to Commit Mail and Wire Fraud Conviction
#### a.    Applicable Law

As discussed, Mitchell was convicted under 18 U.S.C. § 1349 of one count of conspiracy to commit mail and wire fraud. To establish a conspiracy to commit mail and wire fraud, the government must prove that: (1) two or more persons made an agreement to commit fraud; (2) the defendant knew the unlawful purpose of the agreement; and (3) the defendant joined in the agreement willfully, that is, with the intent to further the unlawful purpose. *See Grant*, 683 F.3d at 643; *Ford*, 558 F.3d at 375. "An agreement may be inferred from concert of action, voluntary participation may be inferred from a collection of circumstances, and knowledge may be inferred from surrounding circumstances." *Grant*, 683 F.3d at 643 (quoting *United States v. Stephens*, 571 F.3d 401, 404 (5th Cir.2009)).

Turning to the substantive crimes, mail fraud entails: "(1) a scheme to defraud (2) which involves a use of the mails (3) for the purpose of executing the scheme." *United States v. Ingles*, 445 F.3d 830, 835 (5th Cir. 2006) (quoting

*United States v. McClelland*, 868 F.2d 704, 706 (5th Cir. 1989)).  Wire fraud involves: "(1) a scheme to defraud and (2) the use of, or causing the use of, wire communications in furtherance of the scheme."  *United States v. Radley*, 632 F.3d 177, 184 (5th Cir. 2011) (citation omitted).

### b.     The Evidence Against Mitchell

Mitchell does not dispute that Barry perpetrated a mortgage fraud conspiracy that involved a use of the mails and wire communications to further the scheme.  Rather, Mitchell challenges his convictions based on his claim that he was ignorant of the fraudulent activity in which Barry was engaged.  Mitchell thus contends that the government's evidence was insufficient to establish that he was aware of the unlawful purposes of the conspiracy and that he willfully participated therein with the intent of furthering those unlawful purposes.  *See Grant*, 683 F.3d at 643.  Because the record is replete with examples of Mitchell's knowing and willful involvement in the scheme to defraud, we reject Mitchell's arguments.

First, the government introduced at trial a number of e-mails transmitted between Mitchell and Barry that evidenced Mitchell's knowing and willful participation in the mortgage fraud scheme.  In many of these e-mails, although Barry was neither the buyer nor the seller in the property transactions at issue, he provided Mitchell with artificially high target appraisal values.  In others, Barry supplied to Mitchell substantive information about the property transactions, including the names of buyers, sellers, brokers, and other participants in the conspiracy.  Mitchell, in turn, routinely submitted to lending institutions appraisals containing this fraudulent information, and containing property valuations exactly matching Barry's targeted values.

The evidence also established that Mitchell never disclosed Barry's role in these transactions; to the contrary, he purposefully concealed from lenders Barry's participation.  In one e-mail, for example, Mitchell explained to Barry

that a name was needed "on the real property section of [a] report" on which he was working, and he asked Barry "what name other than your own do you want me to use." Further, using information that only Barry could have provided, Mitchell falsified the names of the individuals who had ordered the appraisals he completed in order to conceal from lenders that the properties were being "flipped" at Barry's direction. Nevertheless, on a routine basis, Mitchell fraudulently transmitted to lenders certifications that his appraisals were accurate, that he arrived at his conclusions independently, and that he disclosed the nature of any significant assistance he received in preparing his appraisals.

In another series of e-mails, Mitchell requested from Barry a copy of a housing form generated in connection with a private sale so that Mitchell could use the associated data as a comparable property in another of his appraisals. Barry responded by sending Mitchell a list of private sales for all the properties involved in the scheme. Information about these private sales was not publicly available, and because the likelihood of fraud increases when lenders are unable to confirm ownership and sales records from publicly available sources, using these forms to acquire comparable values for an appraisal violates industry standards. However, Mitchell used this information to produce his appraisals, and subsequently failed to disclose that he had obtained the underlying data from Barry.

Mitchell also suggested to Barry properties that could be included in the scheme based on Mitchell's ability to fraudulently inflate their appraised value. In one e-mail, for example, Mitchell told Barry that Barry might be interested in a particular house that was listed with a sale price of $245,900. Although the property had been on the market for 446 days, Mitchell told Barry he could "justify" an appraised value of "at least $575,000 on [the] house." In another instance, Mitchell suggested that Barry acquire a property that had been on the market for 153 days and recently had seen a price decrease of $100,000.

Mitchell indicated to Barry that while the home was listed with a sale price of only $599,900, it was possible to "squeeze about 800 to $825,000 out of [it]." FBI agent Richard Velasquez, the case agent who investigated Barry's scheme, testified that this suggestion did not "comport [with] his understanding of market value from a common sense perspective."

Other e-mails demonstrated that Mitchell was aware that he was engaged in transactions fraudulently involving two sales of a single property. In one e-mail, for instance, Barry wrote to Mitchell: "You and [an alleged co-conspirator] did the appraisals on Millard Pond and it then listed on [a multiple listing service ("MLS")], hence the second sale. . . . And also since it sold twice, closing that could be an issue. Not overly concerned since all our sales are that way." The government also introduced an e-mail Mitchell received from a licensed broker who expressed concerns about the features of the transactions in which Mitchell was engaging. In that e-mail, the broker explained that it could be problematic to regulators if: the sales at issue involved "a closed group of investors"; the lenders were unaware "of the previous sales price or . . . list price"; the properties were "bought at one price and quickly resold for a much higher one within a short time [and there was] little to no tangible reason for the increase"; or "the new buyer of the property on the second sale . . . gets any kind of cash back." The broker expressed that these types of transactions were troubling to "regulators at all levels up to the Justice Department" because they exposed lenders "to large loss in the event of default and forced sale." Another witness testified that these features "describe John Barry's scheme in one paragraph," indicating that Mitchell was aware of the fraud. Finally, Mitchell himself admitted in an e-mail to a co-conspirator that he had been "blacklisted" by two lenders as a result of his appraisal practices, and that a third lender had expressed concerns about his conduct. Despite these many warnings, Mitchell continued to engage in business with Barry.

No. 12-40336

Although the correspondence outlined above reasonably could have led the jury to conclude that Mitchell acted in concert with Barry to perpetrate the mortgage fraud, a rational trier of fact also could have found that Mitchell's appraisals were so far beyond any commonly accepted idea of market value that they were further indicia of his intent to commit fraud.[1] The following examples are demonstrative:[2]

- 810 Hills Creek Drive: This house was listed on the market with a sale price of $375,000 for approximately six months, after which the price was lowered to $350,000. Mitchell appraised it at $545,000.

- 1220 Hills Creek Drive: The owner of this property arrived at a listing price of $315,000 based on comparable sales. Mitchell appraised it at $600,000.

- 7019 Old York Road: A real estate agent advised the owner of this home to list it for $449,000. After it was on the market for few months, the owner lowered the price to $420,000. Mitchell appraised it at $664,000.

- 823 Hills Creek Drive: With the assistance of a real estate agent, the owner of this property valued it at $358,000. Mitchell appraised it at $647,000.

- 4716 Seafarer Court: A real estate agent suggested that this property be listed at $514,000. The house remained on the

---

[1] Mitchell suggests that Jack McComb, an investigator with the Texas Appraiser Licensing and Certification Board who testified for the government, was "not able" to state that Mitchell's appraisals were incorrect as to the actual values of the properties. According to Mitchell, this is significant because McComb was offered as an expert in residential real estate evaluations. Nevertheless, McComb was not retained by the government to prepare separate valuations. Rather, he was asked only to testify as to whether Mitchell's appraisals complied with the Uniform Standards of Professional Appraisal Practice. According to McComb, they did not.

[2] Mitchell contends that the "factual information" in these appraisals—such as the number of rooms, square footage, and other details of the homes—was correct. Mitchell neglects, however, that he falsified information and values related to comparable properties, as well as the ultimate appraised values of the targeted properties. This information, of course, is the very information lending institutions rely on to determine the amount they are willing to lend a borrower.

market for roughly eighteen months, resulting in a price reduction to $482,000. Mitchell appraised it at $698,000.

Sellers repeatedly testified that their properties were worth nothing close to the values at which Mitchell arrived.[3]

In response to the evidence against him, Mitchell submits that the government's case came "down to the fact that [he] appraised property at a higher rate" than the local governmental appraisal body. This suggestion is based on Mitchell's argument that Agent Velasquez stated that, in his opinion, "based on the Collin County Appraisal District records," the appraisals Mitchell submitted "were all too high." Mitchell contends this was improper because tax appraisals are an inappropriate measure of the value of property. He notes that federal law even provides that appraisals submitted in connection with federally-related transactions cannot be based on property tax records, but rather must be performed by certified or licensed appraisers.

Mitchell ignores, however, that the government introduced tax values merely to provide a baseline estimate of the value of a particular piece of property. The government never represented, in other words, that tax assessments were anything more than a data point to orient the jury. Indeed, Agent Velasquez himself testified that tax value is "a baseline" and a "kind of starting point of what value should be." Further, when asked if tax value was simply a "data point," he responded, "[t]hat's all it is." The government thus did not improperly rely on tax assessments—much less base its entire case on them.

Rather, the government's evidence of Mitchell's participation in Barry's mortgage fraud scheme was overwhelming. As he did at trial, Mitchell does no more on appeal than offer an alternative theory—namely, that he was ignorant

---

[3] Mitchell suggests that the evidence showed that the sellers of the homes he appraised all had "financial incentives" to accept lower prices—incentives such as "job transfers, troubled marriages, [and] carrying two mortgages." This assertion, however, is unsupported by the record.

of the conspiracy and simply was sloppy or incompetent in preparing the appraisals at issue.[4]  Mitchell's argument, however, neglects that we must view the evidence in the light most favorable to the verdict.  *See Ford*, 558 F.3d at 375.  While the jury was free to adopt Mitchell's construction of the evidence, it declined to do so.  *See Pigrum*, 922 F.2d at 254.  Given the extent of the evidence against him, a reasonable trier of fact easily could have found that the government established Mitchell's guilt beyond a reasonable doubt.  *See Moser*, 123 F.3d at 819.

### 3.    Mail Fraud Convictions

Mitchell also was convicted under 18 U.S.C. §§ 1341 and 2 of two counts of mail fraud.  The charges underlying these convictions relate to fraudulent loan documents mailed in connection with properties at 823 Hills Creek Drive and 7019 Old York Road in McKinney, Texas.  Evidence introduced at trial demonstrated that Mitchell appraised these properties as part of the scheme to secure fraudulently inflated mortgage loans from Washington Mutual in San Antonio, Texas, and Oak Street Mortgage in Carmel, Indiana.

### a.    Applicable Law

As previously noted, the federal mail fraud statute requires the government to prove: "(1) a scheme to defraud (2) which involves a use of the mails (3) for the purpose of executing the scheme."  *McClelland*, 868 F.2d at 706.  "The Government is not required to prove that the defendant specifically intended for the mails to be used in furtherance of the alleged fraudulent scheme."  *United States v. Whitfield*, 590 F.3d 325, 354 (5th Cir. 2009).  Rather,

---

[4] In response to this suggestion, the government argued at trial that the evidence clearly established that Mitchell's actions were not simply the result of innocent mistakes.  If that had been the case, the prosecutor contended, the law of averages would have led to some of the "mistakes" resulting in increased appraised values, and some resulting in lower values. The government suggested to the jury, however, that "Mr. Mitchell did not make at least 35 mistakes in a row that all coincidentally inflated the property values of these homes . . . . That is impossible."

"[t]he test to determine whether a defendant caused the mails to be used is whether the use was reasonably foreseeable." *United States v. Mann*, 493 F.3d 484, 493 (5th Cir. 2007); *see also Pereira v. United States*, 347 U.S. 1, 8–9 (1954) ("Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used.").

### b.     The Evidence Against Mitchell

Mitchell does not advance an independent challenge to the substantive mail fraud counts.  Rather, in generally arguing that "[t]here was legally insufficient evidence for the jury to find [him] guilty as alleged in the indictment," Mitchell again merely asserts that he was unaware of the criminal scheme.  As explained above, however, there was ample evidence from which a reasonable trier of fact could have concluded that Mitchell was a willful participant in the fraudulent mortgage scheme.  Likewise, the evidence was sufficient to establish that Mitchell knew, or intended that, the mails would be used to further the scheme.

In connection with the mail fraud statute, we previously have explained that "[t]he requisite statutory purpose exists if the alleged scheme's completion could be found to have been dependent in some way upon the information and documents passed through the mails, . . . and if the use of the mails was an integral part of the scheme to defraud." *McClelland*, 868 F.2d at 707 (omission in original) (internal quotation marks and citation omitted).  Here, the false loan documents mailed to lenders were essential to obtaining the fraudulent loans.  Moreover, the jury rationally could have found that it was reasonably foreseeable to Mitchell that the mails would be used to advance the scheme.

First, it was reasonable to conclude that Mitchell's experience in the mortgage industry made him aware that those within the industry routinely use the mail to transmit documents to one another. *See Whitfield*, 590 F.3d at 355.

Second, several of Mitchell's co-conspirators testified that loan documents regularly were transmitted by mail, suggesting that Mitchell was aware that the mail ordinarily was used to conduct business. *See Pereira*, 347 U.S. at 8–9. Finally, because the lenders at issue were not located in the same geographic area as the conspirators, the jury rationally could have concluded that the mail was used to perpetrate the conspiracy—especially given testimony to this effect offered by one of the conspirators. *See United States v. Flores–Chapa*, 48 F.3d 156, 161 (5th Cir. 1995) ("Juries are free to use their common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life when giving effect to the inferences that may reasonably be drawn from the evidence.").

In sum, the evidence was sufficient for the jury to convict Mitchell on all charged counts. *See Seale*, 600 F.3d at 496–97.

## B.    Sentencing

The district court sentenced Mitchell on March 27, 2012, to a below-Guidelines sentence of 120 months' imprisonment for each count, with the sentences to run concurrently. Mitchell also was ordered to pay $8,245,423 in restitution and to serve three years of supervised release. On April 18, 2012, the court held a hearing to determine whether the withdrawal of Mitchell's attorney immediately after the sentencing hearing had impacted Mitchell's rights, and whether recently decided Supreme Court cases were at all implicated in his case. By that time, Barry had been sentenced to a term of 180 months, which provoked the district court to express that, "in hindsight," it did not believe that Mitchell "was two-thirds as much responsible as Mr. Barry." Accordingly, the court stated "for the record that were [it] to sentence [Mitchell] today, [it] would sentence him to about 84 months." Ultimately, however, the court concluded that it did not have the authority "to sua sponte reduce Mr. Mitchell's sentence."

No. 12-40336

Mitchell did not assert an objection when these comments were made, and he does not now contend that the district court committed any error when it first imposed sentence. Rather, he argues that the court erred when it "maintained the sentence and the lead defendant, the most culpable defendant in this case received, pursuant to an agreement with the Government, a sentence only one-third longer than Mr. Mitchell's." In other words, Mitchell asserts that the district court erred in failing to sua sponte resentence him, and he thus argues that he is entitled to a new sentencing hearing. For the following reasons, we reject Mitchell's claims.

### 1.    Standard of Review

We review de novo whether the district court had authority to resentence a defendant. *United States v. Ross*, 557 F.3d 237, 239 (5th Cir. 2009); *United States v. Bridges*, 116 F.3d 1110, 1112 (5th Cir. 1997).

### 2.    Applicable Law and Related Discussion

"A federal court generally 'may not modify a term of imprisonment once it has been imposed.'" *Dillon v. United States*, 130 S. Ct. 2683, 2687 (2010) (quoting 18 U.S.C. § 3582(c)). However, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 131 S. Ct. 2685, 2690 (2011). Specifically, 18 U.S.C. § 3582(b) authorizes a court to modify a sentence in a limited number of circumstances, such as:

> (1) when the court receives a motion from the Director of the Bureau of Prisons indicating there are extraordinary and compelling reasons warranting a reduction and that reduction is consistent with applicable policy statements issued by the Sentencing Commission; (2) pursuant to Rule 35[(a)] of the Federal Rules of Criminal Procedure the district court, acting within [14] days after the imposition of sentence, corrects an arithmetical, technical, or other clear error identified in a previously imposed sentence; and (3) when a defendant who has been sentenced to a term of imprisonment based upon a sentencing range that has subsequently been lowered by the Sentencing Commission.

14

*Bridges*, 116 F.3d at 1112. Although, as noted, Rule 35 permits modifications in certain narrowly defined circumstances, it "is not intended to afford the court the opportunity to reconsider the application or interpretation of the sentencing [G]uidelines or for the court simply to change its mind about the appropriateness of the sentence." *United States v. Lopez*, 26 F.3d 512, 520 (5th Cir. 1994) (quoting Fed. R. Crim. P. 35 advisory committee's note).

Here, Mitchell concedes that the district court "indicated by its statements and actions that it was aware that the federal sentencing [G]uidelines were advisory," and that the sentence "comports with *United States v. Booker*, 543 U.S. 220 (2005)" because the court sentenced Mitchell "in accordance with the factors set forth in 18 U.S.C. [§] 3553(a)." Mitchell also admits that the court "interpreted and applied the Guidelines, resulting in a sentence that may be considered legally reasonable." Finally, Mitchell expresses awareness "that a district court's authority to modify or correct a sentence is limited to specific circumstances"—namely, those set forth in 18 U.S.C. § 3582(c)—and he acknowledges that § 3582(c) does "not apply in this case." Nevertheless, Mitchell argues that the court erred when it maintained his sentence when, in the hearing conducted after sentencing, it expressed that *were* it to resentence him, it would impose only "about 84 months."

As the district court concluded—and Mitchell himself acknowledges—Mitchell's sentence was reasonable.[5] Although Mitchell believes the court should have sua sponte resentenced him, "a district court is not permitted to withdraw a reasonable sentence and impose what is, in its view, a more reasonable one." *Ross*, 557 F.3d at 243. Moreover, as Mitchell concedes,

---

[5] On this score, we note that (1) the factors the district court considered in selecting Mitchell's sentence were all relevant, proper factors; (2) there are no other factors relating to Mitchell that should have received significant weight; and (3) the district court did not err in balancing the sentencing factors. *See United States v. Smith*, 440 F.3d 704, 707–08 (5th Cir. 2006); *see also Booker*, 543 U.S. at 261.

No. 12-40336

the district court had no authority under 18 U.S.C. § 3582(c) to modify Mitchell's sentence. Thus, while the court may have "change[d] its mind about the appropriateness of the sentence" after it was imposed, such misgivings are not reflective of error. *Lopez*, 26 F.3d at 520. Simply put, because the court had no authority to resentence Mitchell, it committed no error, plain or otherwise, in declining to do so.

### III. CONCLUSION

Accordingly, we AFFIRM the district court's judgment.